## AIR LIFT, LTD. *v.* BOARD OF COUNTY COMMISSIONERS OF WORCESTER COUNTY, MARYLAND ET AL.

[No. 442, September Term, 1970.]

*Decided June 3, 1971.*

370

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Lance W. Billingsley* for appellant.

*Lee W. Bolte* and *Raymond D. Coates* for appellees.

BARNES, J., delivered the opinion of the Court.

The Circuit Court for Worcester County (Prettyman, J.) issued a temporary injunction on July 17, 1970, and, after a hearing on the merits, issued a permanent injunction on July 22, 1970, enjoining the appellant, Air Lift, Ltd., a Maryland Corporation, one of the defendants below (Air Lift), as well as other defendants, from conducting a rock festival or concert on land near the Town of Berlin in Worcester County on July 25, 1970.

Two bills of complaint were filed praying for injunctive and other relief. One, No. 9044 Chancery, was filed on July 17, 1970, by the Board of County Commissioners of Worcester County (County Commissioners) and property owners whose land was in the immediate vicinity of the site of the proposed rock concert against G. Hale Harrison, Jr. and others who owned the site, the tenant of the site, Air Lift, and two alleged sponsors of the contemplated "Rock Festival," *i.e.*, Tom Curtis and Fred B. Norris. The other bill of complaint, No. 9045 Chancery, was also filed on July 17, 1970, by the Board of Education of Worcester County (Board of Education) against Air Lift and the owners of the site. Both bills of complaint were fully verified. They were consolidated for hearing before the Chancellor.

The principal questions before us are in regard to the sufficiency of the evidence to support the issuance of the temporary and permanent injunctions, certain rulings of the Chancellor on the admissibility of evidence, the fairness of the trial, and the form of the permanent injunction. We have concluded that there was sufficient evidence to support the issuance of the injunctions, that there were no prejudicial rulings by the Chancellor on the evidence, that the trial was fair, but that the lan-

guage of paragraph 2 of the order of July 22, 1970, for a permanent injunction was improper, requiring a reversal on this ground, but an affirmance so far as the first three questions are concerned.

Although both bills of complaint prayed for "Ex Parte" injunctions, the Chancellor — having been made aware on July 16, 1970, of the intended application for those injunctions—made arrangements for the defendants to appear on Friday, July 17, at 9:00 A.M. to be heard pursuant to the provisions of Maryland Rule BB 72 a. The Chancellor, in view of the importance and gravity of the requested injunctions, requested Dr. Fred S. Waesche, Deputy State Health Officer for Worcester County, and Lt. Col. Paul J. Randall, Chief of Operations of the Maryland State Police, to appear as experts and to advise the Chancellor in regard to the matters under consideration. Counsel for the parties and other interested persons were duly notified and those who wished to appear at the hearing did appear including, of course, counsel for the parties. The hearing on July 17 began at 9:20 A.M. and continued until 3:30 P.M. In addition to Dr. Waesche and Lt. Col. Randall, other witnesses—appearing at Lt. Col. Randall's request—were heard by the Chancellor, who at the end of the hearing granted the "Ex Parte" or temporary injunction and dictated his reasons for this action. Counsel for Air Lift then requested an immediate hearing on the merits to determine whether the injunction should be made permanent or dissolved. The Chancellor granted this request and assigned the cases for such a hearing on the merits for the following Monday, July 20, at 10:00 A.M., having cleared the Court calendar of scheduled criminal cases in order to have the hearing.

The hearing on the merits began at 10:00 A.M. on Monday, July 20, and continued until 7:40 P.M. on that day recessing to the following morning, July 21, at 10:00 A.M. The hearing continued on July 21 from 10:00 A.M. to 5:45 P.M. During a recess at 4:30 P.M. on July 21,

all counsel requested the Chancellor to state his opinion orally at the conclusion of the hearing, the Chancellor to file a written opinion and order the following day, Wednesday, July 22, at 11:00 A.M. This schedule was carried out. The Chancellor, on July 21, announced that the injunction would be made permanent and, on July 22, filed a written opinion, with findings of fact and conclusions of law, together with an order making the injunction permanent and providing for other matters.

The parties have considered the questions in regard to the sufficiency of the evidence to support the "Ex Parte" and the permanent injunctions together in their briefs and at argument. This was proper inasmuch as the evidence produced through Dr. Waesche and Lt. Col. Randall and the other officers of the Maryland State Police at the hearing on July 17 in regard to the "Ex Parte" injunction was largely duplicated in their testimony at the hearing on the merits on July 20. We will follow this same method in considering these questions.

The evidence shows that sometime in April or May, 1970, Air Lift, through its president, Thomas Curtis, began to make plans to hold a "Rock Affair" in Worcester County and began looking for a site. There were negotiations with G. Hale Harrison, Jr. and other members of the Harrison family, who owned the "Home Farm" containing 181 acres on the outskirts of the Town of Berlin, to lease the Home Farm for a rock festival or concert to be held on Saturday, July 25, 1970. Although the negotiations had progressed to the point of the submission, pursuant to an option to lease under certain conditions, of a proposed written lease for execution by the owners of the proposed site, the lease had not been executed on July 20 when the hearing on the merits was held.

The proposed site lies on the south side of U. S. Route 50. Substantially separating the Home Farm into two parcels is the tract of approximately 27 acres owned by the Board of Education and on which the Stephen De-

catur High School has been erected. This high school serves the northern portion of Worcester County and contains 30 classrooms as well as other rooms, a gymnasium and cafeteria, all occupying approximately 100,000 square feet and serving approximately 1,000 students during the school year. There are athletic fields to the rear of the school buildings and a few trailers serving as temporary classrooms. The value of the school property is approximately $4,000,000.

The portion of the Home Farm lying to the west of the high school property has a frontage of about 1,300 feet on U. S. Route 50. We will refer to this portion of the site as the "West Lot." The remaining portion of the Home Farm lies to the east of the high school property and has a frontage of approximately 1,200 feet on Maryland Route 50. This will be referred to as the "East Lot."

The Home Farm is located in an area of residential and commercial development along U. S. Route 50 near its intersection with Maryland Routes 346 and 452 and a county road known as the "Stephen Decatur High School Road." The westerly boundary line of the last-mentioned county road is the only line of demarcation between the school property and the West Lot. U. S. Route 50 is the only east-west means of access by paved road to and from Ocean City, Maryland's popular ocean summer resort located in Worcester County on the Atlantic Ocean. Maryland Route 452 carries traffic to and from U. S. Route 50 to Delaware and the north; Maryland Route 346 carries traffic to and from U. S. Route 50 and U. S. Route 113 to Virginia and the south as well as local traffic between the Berlin area and Ocean City. Stephen Decatur High School Road is in fact an extension of Maryland Route 452 and carries traffic to and from the Berlin area to Maryland Route 376 leading to Assateague Island State Park and Assateague National Seashore.

The assessed value of the real and personal property

of the 54 non-public plaintiffs in No. 9044 Chancery is $754,665. As indicated, the value of the high school property is approximately $4,000,000. In addition to the individual residences and lands of property owners near the proposed site, there is a service station at the northern intersection of U. S. Route 50 and Maryland Route 452; a furniture store on the southeasterly side of U. S. Route 50 adjoining the East Lot on the east, with a building supply firm adjoining the furniture store to the east; a used car dealership is directly across from the site on the northerly side of U. S. Route 50; and, an A & P Supermarket, serving the northern end of Worcester County (including Ocean City) to the west of the West Lot near the apex of a triangle formed by U. S. Route 50 and Maryland Route 346; and, to the west of the supermarket, there are a service station, trailer rental agency and a new automobile dealership. The site is a short distance from the town limits of the Town of Berlin.

All of the West Lot and most of the East Lot were zoned by the County Commissioners as A-1 for agricultural use. The northerly frontage of the East Lot, with a depth of approximately 100 feet, was zoned as B-2 for business use.

T. Howard Collins, for six years Inspector for Worcester County Planning and Zoning, testified at the hearing on July 20. After indicating his familiarity with the site and describing it and the applicable zoning, Mr. Collins identified the applicable zoning map which was introduced into evidence. Mr. Collins also testified that no one had obtained a permit from the zoning authorities to hold a Rock Festival on the site on July 25. He stated that when an application for a zoning permit was submitted to his office, the Department of Health was notified. Section 18.2 of the Worcester County Zoning Ordinance requires the obtention of a zoning certificate for the proposed use of the land and Section 18.4 provides that the County Commissioners as well as adjacent

and neighboring property owners, who might be specially damaged, may institute injunction proceedings on the basis of a violation of the Zoning Ordinance.

On cross-examination, it was elicited that under Article 6, Section 6.103 of the Zoning Ordinance, it was provided:

> " 'As a permitted use in an A-1 district are churches and parish houses; schools and colleges including dormitories; public parks, playgrounds, beaches, landings, community centers, game preserves, and other buildings, structures, and properties of a recreational, cultural, administrative, or public service type.' "

Two letters from Mr. Collins, as Zoning Inspector, were also identified and introduced into evidence. One was a letter of May 28, 1970, addressed to John Richard Faucette (apparently John Richard Faucett, husband of Helen Harrison Faucett, one of the owners of the site, both parties defendant in No. 9044, Chancery) at Ocean City, and which read as follows:

> "Regarding your inquiry this date relative to the use of your lot located on the south side of Rt. 50 at High School Road for a political rally or similar use for one day only, it is our opinion that as this is for only a one day temporary use, located in a 'B-2' Business District and no buildings or structures are involved, no zoning regulations are involved and therefore, a permit will not be necessary from this office."

The other letter was dated June 1, 1970, also addressed to Mr. Faucette and was, in relevant part, as follows:

> "I regret to advise that in granting you a temporary permit for a public rally to be held at the intersection of High School Road and Rt.

50 on the property of Mrs. Hale Harrison, was in error.

"Following my letter of May 28th, I made a closer study of the Ordinance and find that under Section 13.204, all outdoor meetings are subject to the approval of the Board of Appeals for Worcester County and will require your filing an application and appeal to said Board. The cost of appeal will be $25.00 and must be subject to a public hearing following two weeks advertisement of the hearing, therefore, please consider my letter of May 28, 1970 an administrative error on my part and should you desire to seek Board approval, I shall be very glad to assist you in filing the necessary papers."

It will be observed that the original application by Mr. Faucette was apparently for a "political rally or similar use." This application was withdrawn without final administrative or judicial consideration.

Air Lift contends that the proposed use is a recreational and cultural use, permitted in an A-1 zone; but, as the Chancellor aptly pointed out, this contention could only be explored in a proceeding before the Zoning Authorities *after* an application for a permit or certificate of use had been filed and proper proceeding held in regard to such application. The contention could not be raised nor decided collaterally in the pending injunction proceeding. See *Spintman v. Chesapeake & Potomac Tel. Co.*, 254 Md. 423, 255 A. 2d 304 (1969) and cases cited therein.

Dr. Waesche, a Deputy State Health Officer and the County Health Officer for Worcester County since July 1947, testified on behalf of the plaintiffs. His testimony given at the hearing of July 17 was incorporated into evidence by stipulation of counsel. He stated in his testimony that he had not issued any permit for any rock festival and no application for such a permit had been submitted to the Department of Health; that if such an

application had been submitted, the principal matters which would have been considered by the Health Department were suitable provision for potable drinking water, provision for waste material—sanitary, bulk and dry waste—as well as the preparation, delivery, refrigeration and serving of food for the 20,000 to 30,000 persons estimated as the number who would attend the rock festival or concert; that he had available in the office professional and scientific literature to be used as guidelines for supplying the things mentioned for a large group of this kind; and, that if 25,000 people attended, 80 portable toilets would be required; and that approximately 3,125 gallons of water on a 12-hour basis would be required and on a 16-hour basis 4,164 gallons would be necessary.

Dr. Waesche also testified that no private citizen in Worcester County had been required to supply portable toilets because "there is no private citizen in Worcester County able to do that." He stated that his office estimated that there would be approximately 12½ tons of rubbish, garbage and solid waste; that no arrangements had been made to furnish emergency medical service; that his office had been advised on July 17 by an establishment in a neighboring town that it had been requested to provide 25,000 peanut butter and jelly, plain cheese and bologna sandwiches for the proposed rock festival. The concessionaire stated he planned to use a truck body with ice on it to keep the food cold, but had been unable to rent a refrigerated truck. The suppliers would furnish soft drinks in cans.

Dr. Waesche also stated that Frank Polar (one of the promoters) was in his office the morning of the hearing and had been advised that the Health Department had estimated that it would take approximately 320 cubic feet of refrigerated space to store the 25,000 sandwiches and that the Department would wish to view the facilities of the concessionaire to prepare, store and transport the food in view of the large volume. He also testified

that the health requirements for one-day events were in the applicable regulations and that a health permit was required for a one-day rock festival, but that there had never been an application for a permit for a rock festival in Worcester County during his tenure as County Health Officer and indeed for "any proposal of this magnitude in Worcester County within the time that I have been holding the position that 1 do." The County Health Department had never issued a permit for any one-day affair; church suppers one-day benefits and the like operated under permits issued on an annual basis something like a restaurant receives, the Health Department inspecting the facilities for dispensing food and drink just as it did for commercial establishments and subject to the same standards.

Dr. Waesche expressed the opinion that in the absence of plans indicating provision for the health facilities and requirements mentioned by him, the holding of the contemplated rock festival would "be a potential threat and danger to the public health. . . ."

James R. Trader, Supervisor of Sanitation in the Worcester County Health Department, who had been with the County Health Department since 1954 with a B.A. degree from Washington College, testified for the plaintiffs. He stated that if an application were filed for the assembly of 30,000 persons, each case would depend upon its own specific merits, depending on what the promoters "wanted to conduct on the premises." The Health Department would then "review with them what * * * the requirements [would be] as far as drinking water, sewerage disposal, solid waste disposal, and general food handling facilities [were concerned]." He had discussed these matters generally with Mr. Polar on the telephone on July 17 "but we still haven't come to any specific conclusion. We have only talked in generalities as to what might or could be done." Mr. Trader confirmed Dr. Waesche's testimony in regard to the requirement for portable toilets but was of the opinion that between 80 to

100 would be required, or if the recommendations of the Port-O-Let Company be followed, some 700 portable toilets would be required. Mr. Trader could recall the issuance of only one one-day permit for an affair in Ocean City. He stated that the position of the Health Department was that the promoters "provide adequate facilities and the only way we have of knowing of what you propose is to have something concrete submitted which we would review with you [the promoters]. To this date, we do not have it."

The next three witnesses for the plaintiffs were officers of the Maryland State Police. They were Detective Sergeant Paul H. Rappaport, in charge of the Maryland State Police Intelligence Unit based at Pikesville, Maryland, who came into the State Police as a Trooper in 1955 becoming a Criminal Investigator in 1962, and in charge of Intelligence for approximately one year; Captain Thomas E. Veditz, Captain in charge of Troop D of the Maryland State Police which serves eight Eastern Shore Counties including Worcester County; and, Lieutenant Colonel Paul J. Randall, Chief of Operations of the Department of Maryland State Police.

Sergeant Rappaport explained that the Maryland State Police Intelligence Unit is a member of a national organization known as Law Enforcement Intelligence Units (LEIU), to which units in Canada also belong. This organization gives a ready reference to other Intelligence Units and the information in regard to rock festivals was, in part, obtained through persons connected with this organization. In describing the information received in regard to the Woodstock (or Bethel) Rock Festival, Sergeant Rappaport identified by name the New York State Trooper and Major who were at that festival and who reported the law enforcement and other problems which resulted from it.

At the Woodstock Festival, scheduled to last three days (but lasting five days), the estimated number of persons who would attend was 50,000 but in fact be-

tween 400,000 to 450,000 persons attended. Although the promoters had provided surface water lines, these were broken when vehicles passed over them. Medical facilities, medical tents, ambulances, etc. were provided but were found to be inadequate. When the traffic stopped so did the ambulances and transportation to the medical tents, requiring that the Army and helicopters be called in. Three or four hot dog stands were provided for food. The promoters did seek to employ 300 off-duty New York City policemen to police the festival but they were ordered by the New York Police Commissioner not to be so employed. Narcotics were freely sold like "a hot dog vendor would sell hot dogs at a ball game." It was a "Drug Bash." The police did arrest over 100 persons for violation of the narcotic laws (by 51 plain-clothed detectives who were working on the job) but many were not arrested because the drug vendor would yell, "Narc," whereupon the crowd would intercede to prevent the arrest, rough up the police officer so that the narcotic vendor would escape into the crowd and sell his narcotics elsewhere. "Nudity ran rampant" and "alcohol was extremely prevalent," a great number of the crowd being under the influence of alcohol. Two persons died during the festival, one from an overdose of narcotics, the other from being run over by a vehicle while asleep in a sleeping bag. Thousands were injured, many by foot injuries from broken glass in the mud created by a rain storm. There were many injuries resulting from overdoses of narcotics. Water was in short supply and that available sold for fifty cents a glass. A fence around the area — a snow fence type—went down the first day.

Another rock festival was scheduled for July 11, 1970, at Mountaindale, Sullivan County, New York, in the Catskill Mountains. It was stopped by Court injunction but 16,000 persons came any way and "held a festival of their own."

A rock festival was held over the July 4th weekend, 1970, in Byron, Georgia. Sergeant Rappaport identified

by name the three officers of the Georgia Bureau of Investigation who were on duty on that occasion. Byron is approximately 100 miles south of Atlanta. It was estimated that 50,000 persons would attend but not over 75,000 at a maximum. In fact, between 125,000 to 200,-000 attended. One of the officers stated, "It was nothing but a den of iniquity." It created mass disturbance and destruction. Like the rock festival at Woodstock, narcotics were freely sold, the crowds prevented the law enforcement officials from enforcing the narcotic laws, one officer being assaulted and his gun and handcuffs were taken away from him when he attempted to make an arrest. There was swimming in the nude. When the Byron festival was over, many were camped on neighboring property. The original area was in a drag strip, the Peach County Raceway, but those attending spread over a two to three mile area. Here again, portable toilets were used; but when traffic stopped—as it did — "everything else stopped." Again, the Army was called in and injured persons removed by helicopters. The injuries were principally from overdoses of drugs and sunstroke. A neighboring farmer refused to rent an adjacent field to the promoters, but the crowd cut the separating fence, entered the farmer's property and "did a great deal of damage." When traffic was tied up in a traffic jam, some of those attending the festival would jump on the hoods or on top of the stalled automobiles; and if the operator would object, they would "smash out the windshield of the vehicle, trounce on the hood and the top of the vehicle, say they were sorry, get off and go to the next car and do the same thing."

Sergeant Rappaport then gave the experiences of the State Police in regard to weekly rock festivals in Montgomery County, Maryland. The crowds involved were much smaller than those at the other rock festivals already mentioned, being in the hundreds rather than thousands although on one occasion the crowd was between 1,000 to 2,000 persons. In these festivals, however,

drugs were openly sold and taken, it being announced on one occasion from the bandstand who had drugs for sale and their price. There was nudity and "sexual intercourse was prevalent out in the open." Here again, arrests were difficult and sometimes impossible to make because of the crowds.

There was difficulty also at the rock festival concerts at Columbia held at the Merriweather Post Pavilion which seats approximately 5,000 people plus those who are seated on the lawn area outside the pavilion. The later part of June 1970, 6,000 to 7,000 persons attended, attempted to storm the gates and did several thousand dollars worth of damage. The second festival drew an attendance of 20,000 persons who were backed up one half mile for tickets. They paraded where they pleased, urinating in public, threw beer cans and missiles.

Sergeant Rappaport expressed his opinion that if the proposed rock festival were held on July 25, narcotics would be sold and used, with little law enforcement; alcoholic beverages would be consumed openly and by minors as well; there would be public fornication; and, there would be injuries to both public and private property.

On cross-examination Sergeant Rappaport admitted that he personally had not attended any of the rock festivals we mentioned but relied on the information given to the Department of Maryland State Police through the officials and organization he had mentioned. He did not know the officials mentioned by him and listed in LEIU, but accepted the truth and veracity of those officials and their reports.

Captain Veditz relied upon the reports and the testimony of Sergeant Rappaport in regard to rock festivals. His testimony was principally directed at the traffic hazard involved if the proposed rock festival were held. He testified that he had 122 Troopers in Troop "D" to service eight counties, including Worcester County, as we have stated. If 30,000 persons were to attend the con-

templated rock festival, approximately 10,000 vehicles would attempt to enter the site throughout Saturday or the duration of the festival. At the time of the hearing there was already a problem resulting from the congestion of traffic on U. S. Route 50, as well as on the other roads already mentioned. There would be additional traffic congestion resulting from left-hand turns of vehicles coming from Ocean City to the site. Traffic would back up and there would be a blockage of essential services. It would take between 24 and 30 State Troopers just to handle traffic. In Baltimore City at the rock festival in the Civic Center — an ideal place to hold one from the law enforcement point of view because it is enclosed with definite seating arrangements and a stage —it required between 250 and 300 police officers to be present at that affair. In his opinion, there would be mass confusion and a traffic hazard which would result if the contemplated rock festival were held.

Lt. Col. Randall testified that Capt. Veditz would only be able to provide 50 Troopers out of a complement of 122 police personnel if the contemplated rock festival were held and that these Troopers would not enter private property unless a crime were committed, reported as having been committed or there was reason to believe one was being committed on the site. He stated:

"* * * based on the testimony Friday and again today, experiences of other recognized agencies, our own within the State over at Columbia, of the New York State Police at Woodstock, what happened in Georgia, what happened reportedly just last weekend, a place called Love Valley, North Carolina, we would recognize, based on all of the elements, all of the ingredients, everything that has been testified to here, Friday and again today, the widespread use of narcotics, the flagrant use or consumption of alcoholic beverages, and the attitude, the anti-establishment type of frame of

mind or attitude of some of these people—not all of them, but some of them—and their inclination toward dissent, we recognize in this all of these elements put together in one bundle something explosive; at least it has the potentiality. It has the potentiality."

He also stated that the hazards mentioned would be substantially aggravated if there were a severe summer electric storm with a heavy downpour during the festival. The obvious and nearest place for the crowd to go would be in the high school buildings and these would be taken over. In his opinion, if there should be a general disorder requiring the police to use dispersal tactics, the holding of the contemplated rock festival at the site, due to the proximity of the Town of Berlin, the stores, the highway and Ocean City, "would result in a real problem. It could result in destruction of property. It could result in vandalism, result in thievery, it would result in most anything in my judgment once a movement was made."

Mr. Harrison, recalled as a witness by the plaintiffs, testified that negotiations for a lease of the site had been held with Thomas Curtis and Frank Polar and that the original estimate for those attending was 50,000. The tickets were to be sold for $5.00 each for advanced sales and $7.00 at the site. He had no idea in regard to how many tickets had been sold. None of the tickets had been delivered. The poster advertising the event listed some 25 places, some in the greater Washington area, some in the Baltimore and Delaware areas and one in Philadelphia—where tickets could be obtained. The land owners had received no money. In the unexecuted lease, the land owners were to be paid $2,500.00 with a percentage of the proceeds. Mr. Harrison admitted that he had stated: "Even at this date the crowd is almost assured whether or not an injunction is filed. I guess it's safe to say the kids are going to be here. They're going to be in Ocean City or on our farm. The Town can take

its fit (*sic*—pick?)." The owners have invested no money in the proposed rock festival; the only expenses they have incurred are counsel fees.

The last witness for the plaintiffs was R. Calvin Hall, Sheriff of Worcester County. Sheriff Hall was Deputy Sheriff for seven years prior to his election as Sheriff in 1966. Sheriff Hall is a member of the Maryland State Sheriff's Association, the National State Sheriff's Association, the Eastern Shore Police Association and the Chiefs of Police Association of the State of Maryland. He is also a member of the Maryland Crime Commission of the First District, First Region, which sits on an average of once a month. He has cooperated with the Federal Bureau of Investigation and with the Maryland State Police, the Federal Narcotics Bureau, the Agents of the Maryland Alcohol, Tax and Import Unit as well as with Federal Agents in the Post Office Department and the Armed Services, in the enforcement of law in Worcester County. His jurisdiction includes Ocean City and, of course, the site and the Stephen Decatur High School property. As Sheriff, he and his four full-time Deputies, have the duty to maintain law and order in Worcester County and to serve process in civil cases. Counsel for Air Lift, although conceding that Sheriff Hall had general expertise in enforcing the law in Worcester County, did not concede his expertise in rock festivals inasmuch as he had not been involved in them and knew nothing about them personally. The Chancellor was of the opinion that, being qualified as an expert in law enforcement, Sheriff Hall could express an opinion based on the testimony of Sergeant Rappaport, Captain Veditz and Lt. Col. Randall, and overruled the objection to his testifying as an expert in regard to the proposed rock festival. We will consider this ruling more fully later in this opinion.

Sheriff Hall testified that the all year resident population of Worcester County was approximately 24,000 persons. The summer population of Ocean City, how-

ever, was between 125,000 to 150,000 persons. In his opinion the crowd that would attend the contemplated rock festival—assume it would be 20,000 persons, would, from his experience in Ocean City, by their use of narcotics and resisting arrest, seriously endanger the life of any officer trying to effectuate an arrest. Furthermore, he was of the opinion that from the sketch of the proposed parking arrangements he could not see how it would be possible to park the 13,728 automobiles supposed to be parked and that in crossing the high school property to get to the bandstand area, serious injury would result to that property.

Air Lift produced two witnesses to testify for it, *i.e.*, Gene Myer and Thomas Curtis.

Mr. Myer, from New York City and 28 years of age, received his degree from New York University in 1969. His first rock festival job was at Woodstock, New York in 1969. He designed the water supply system, the size of electric transformers and gave general advice on construction of the stage, the campsite and on some aspects of general design. He prepared budgets and general technical coordination for a proposed festival at Longleat, England and in Osaka, Japan to be held in August 1970, as well as for the Sans Quoi festival then soon to appear in Quebec, Canada. He had not read the applicable regulation of the Maryland Department of Health in regard to the preparation and service of food or in regard to the disposal of waste. He had visited the site the evening before the hearing on July 20. The Chancellor ruled that Mr. Myer was not qualified as an expert in regard to sanitation or food supply but permitted him to testify in regard to other matters relating to rock festivals.

Mr. Myer identified a sketch he had made in regard to the proposed parking indicating Parking Lots No. 1, "A" and "B", the subdivision of Parking Lot 1 being roughly half each of the East Lot; Parking Lot No. 2 being a smaller area to the south of the high school prop-

erty and Parking Lot No. 3 being to the south of the West Lot. The principal portion of the West Lot would have the stage at the north end behind some trees with portable toilets on the east and west sides of the West Lot, all enclosed by a proposed fence. The gate entrance would be on the southeastern corner of the fence on the West Lot and the gate exit would be on the northerly line of the fence, also on the West Lot. The control headquarters would be inside the fence near the gate entrance. The sketch is a freehand one except for the basic outlines of the roads and the lot lines. Mr. Myer explained the sketch in some detail. He admitted that there "definitely will be a conflict between the vacation traffic on Route 50 and the traffic going to the festival." He had no idea of the traffic count on Maryland Route 50. He had made no study of the Worcester County Zoning Ordinance.

Mr. Myer testified that for electrical facilities it was contemplated that generators would be used, the parking lots, 1-A and 1-B, to be illuminated by four to eight lucaalox fixtures, Parking Lots Nos. 2 and 3 receiving their general illumination from the luminaire provided for the audience seating area.

Mr. Myer indicated that the situation at the Woodstock Rock Festival had been greatly exaggerated by the police. He saw no fighting in the crowd and, with one exception, no evidence of vandalism. He admitted that the traffic situation at Woodstock "was really quite poor." He only observed two acts of sexual intercourse but down by the lake "there was a substantial amount of nudity." There were "a few young ladies who were going topless but [this] is an entirely isolated event." He admitted that there were approximately 1,000 cases of cut feet. There were claims against the promoters and their insurance carrier for the destruction of two fences.

Mr. Myer also testified:

"It is definitely true that large numbers of people in the crowd were observed to be smok-

ing marijuana at one time or another. The instances of hard drugs were very substantially less. LSD, which is considerably more stronger than marijuana, a number of people — I saw a number of people whom I thought were under the influence of LSD. I can't say it's much more than a hundred or two hundred who were openly showing the shows to it, you know. To a trained observer — the official New York State Health report lists something on the order of seven hundred ninety instances of persons having LSD trips."

On Sunday, Mr. Myer witnessed the open advertising of marijuana. He never saw an apprehension for a drug offender. He stated that he thought "a large quantity of LSD is still being consumed. It is rather regrettable and it's nowhere near the scale of marijuana or alcohol is, but is still being consumed."

Mr. Myer testified that he knew the promoters of the Mountaindale Festival in New York State and when asked by the Chancellor in regard to any information he might have respecting the spilling over from that site to the surrounding community, Mr. Meyer replied: "Mountaindale was a very unfortunate example of that behavior."

Mr. Curtis, a resident of the District of Columbia, is president of Air Lift. He characterized the proposed rock festival as a twelve-hour concert or long day in the sun. He graduated from Yale University in 1966 and thereafter worked for Senator Robert Kennedy as a press aide. Later he began his own business by operating a restaurant for young people called "Wayne's Luv." He consulted with Mr. Myer in April 1970 in regard to a site for the concert and consulted with other promoters in Philadelphia. He was going to contract for 55 portable toilets and three trucks with a capacity of 3,000 gallons of sewage for the event. He contemplated supplying two physicians and the services of a helicopter and two am-

bulances with two specially trained attendants to be used for the day. He expected to employ 200 student marshals from the Washington-Baltimore area and to pay them $10.00 for the day, plus the cost of their ticket, the money not to be paid until the entire 150 acres were completely clean. He contracted on July 14 with Suburban Investigators for not less than 50 nor more than 90 men for July 25. A supplementary contract added another 50 men. There were arrangements with a catering service to sell soft drinks and a small collection of sandwiches at the site on July 25. An insurance policy was discussed with limits of $100,000 for one person, $1,000,000 for any one occurrence plus $25,000 for property damage for any one occurrence. The proposed policy was mailed to Mr. Harrison but could not be located.

Before the temporary injunction was issued, Mr. Curtis estimated that between 28,000 to 30,000 young people would attend the concert. He thought, in view of the temporary injunction, about 25% of them would now attend.

Advertising for the event was started on July 12 over two radio stations in the Washington area, with 30 spots a week and with printed advertisements in the *Washington Post*, the *Washington Star* and in a magazine in Philadelphia. From 300 to 500 tickets were sold by various outlets but no money was paid to the promoters.

Mr. Curtis estimated that the promoters had spent $25,000 on the project. It was estimated that the gross amount received would be $190,000 with expenses of $65,000 or a net of $125,000. The owners of the site in addition to the fixed amount would receive 14% of the net profit over $100,000.

At the conclusion of the testimony and after argument, the Chancellor, after outlining generally his opinion on the facts and the law, announced that he would make the injunction permanent and would file a written opinion and order the following day, Wednesday, July 22. This was done.

The Chancellor made 19 specific findings of fact from the testimony, having previously stricken out certain newspaper articles originally admitted into evidence and having announced that he would not consider them in any way in reaching his determination of the facts. The 20th finding was as follows:

"20. Finally and perhaps in summary, the Court finds the most frustrating fact of all to be that this event, although conceived by its sponsors to be of such magnitude, had received no firm and careful planning, with executed agreements relative thereto, much less obtaining the approval of interested governmental agencies, prior to the advertising of the event. The testimony clearly reveals a totally disorganized venture characterized by a great amount of talk, discussions, informal concepts and uncertain planning even at a date so late as the date of this hearing. No lease has been formalized by the parties. The person represented to the Court to be the consultant retained to plan the physical site had not even visited the site until Sunday night, had made no study of traffic flow in the area, had not read pertinent Health Department regulations which required compliance and had not made any examination of the surrounding area. Few, if any, firm agreements had been made by him with suppliers of necessary materials, and decisions were yet to be reached with respect to several essential areas. He was so totally unfamiliar with the site as to believe that the site itself consisted of some 25 acres when the plat of the property introduced into evidence clearly showed a size of 90 acres. As an illustration, apparently his meager plans for lighting were based upon a totally erroneous concept of the area involved. The effect of such a clear impression by the Court is

that the Court cannot place any confidence in the plans suggested by the president of Airlift, Ltd. as being adequate to protect the health, safety, welfare and property of the residents of Worcester County in the area adjoining the site of the proposed event.

"Accordingly, the Court is constrained to say, based upon the facts befcre it, and the reasonable inferences that can be drawn therefrom, that there is a clear present and imminent danger to the health, safety, welfare and property of the Complainants, and the residents of Worcester County in the vicinity of the proposed Rock Festival, in case such an event were conducted as proposed by its sponsors. Under such circumstances, the Court finds authority for injunctive relief, among others, in Section 25 of 'Injunctions,' 12 M.L.E.''

Also on July 22, the Chancellor filed the following order:

"1. That the Defendants, Airlift, Ltd., a Maryland corporation, Lois C. Harrison, Hale Harrison, John Henry Harrison, and Helen H. Faucette, be, and they are hereby, enjoined and restrained from conducting a 'Rock Festival' on the premises known as the 'Home Farm' devised unto the Defendants, Lois C. Harrison, Hale Harrison, John Henry Harrison, and Helen H. Faucette, by the Last Will and Testament of G. Hale Harrison, the said premises having been granted unto the said G. Hale Harrison by Union Trust Company, by deed dated February 24, 1944, and recorded among the Land Records of Worcester County, Maryland, in Liber J.E.B. No. 19 at folios 366 thru 368, on July 25, 1970; and

"2. That the Defendants be, and they are

hereby, perpetually enjoined and restrained from conducting a 'Rock Festival', or advertising the same, on the said premises, until plans therefor have been first approved under the provisions of the Worcester County Zoning Ordinance and by the Worcester County, or the State of Maryland, Department of Health, the Sheriff of Worcester County, or the Superintendent of the Maryland State Police, the State Roads Commission of Maryland, if affected by such plans, and the Worcester County Roads Board if affected by such plans; and

"3. That the Defendants, their officers, agents, servants, employees and licensees be enjoined from advertising the Rock Festival on July 25, 1970, at the said time and place, and from selling or causing to be sold, any tickets of admission therefor, and from encouraging, directly, or indirectly, any persons to travel to the said site for the purpose of attending such an event at such time and place; and

"4. That the Defendant, Airlift, Ltd., forthwith announce the cancellation of this event through the same media as used for advertisement to attract persons to the said event, in accordance with the declared intention of Thomas F. Curtis, President of Airlift, Ltd., while testifying on July 21, 1970."

### (1)

An owner of land has the right to use his land for any lawful purpose, subject to regulations imposed by the State in the proper exercise of its police power.

Regulations may be imposed to protect the public from hazards to health and safety and as Judge (later Chief Judge) Prescott said for the Court in *Shell Oil Co. v. City of Baltimore*, 225 Md. 463, 471, 171 A. 2d 234, 238 (1961):

"There is no doubt that the reasonable protec-

tion of the public health and safety is a proper exercise of the police power."

Zoning laws are predicated upon this principle and have been sustained many times by this Court and by other Courts when they represent a reasonable exercise of the police power.

A landowner may not use his property to create a public nuisance, *Burley v. City of Annapolis,* 182 Md. 307, 34 A. 2d 603 (1943), nor to create a nuisance to adjoining property owners. See *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 4 A. 2d 757 (1939).

There is no statute which makes the holding of rock festivals illegal or a nuisance *per se* or even regulating the holding of them, as such, so that the holding of rock festivals or concerts is subject to the zoning, health, fire and police regulations applicable generally to such projects.

In granting an injunction against a contemplated use of property which is not unlawful *per se,* the Chancellor should require the plaintiff to "present to the court strong *prima facie* evidence of the facts upon which his equity rests," see *Haldas v. Commissioners of Charlestown,* 207 Md. 255, 261, 113 A. 2d 886, 889 (1955), and "must prove every material allegation by a preponderance of the evidence." *Rogers v. Maryland-National Capital Park & Planning Commission,* 253 Md. 687, 690, 253 A. 2d 713, 714 (1969).

Air Lift does not dispute these propositions of law. It contends that the plaintiffs below did not meet the burden of proof for either a temporary or a permanent injunction. In our opinion, the plaintiffs did meet their burden of proof and the findings of the Chancellor were supported by the evidence and most certainly were not "clearly erroneous." See Maryland Rule 886.

In view of the importance of the case, we have set out the evidence before the Chancellor in some detail and it need not be repeated here. That evidence is sufficient, in our opinion, to support the Chancellor's finding and

conclusion that "there is a clear, present and imminent danger to the health, safety, welfare and property of the Complainants, and the residents of Worcester County in the vicinity of the proposed Rock Festival, in case such an event were conducted as proposed by its sponsors."

The evidence indicates that there was a singular lack of planning by Air Lift and the promoters of an affair of such magnitude as the facts disclosed. The original estimate of those likely to attend the affair was 50,000 persons although the later figure was apparently reduced to some 30,000 people. This modified figure exceeds by approximately 6,000 people the entire number of all-year residents of Worcester County. When considered in connection with the 125,000 to 150,000 summer visitors in Ocean City, only some 10 miles away and served for ingress and egress from Ocean City by the very highway— U. S. Route 50—which passed the site for the affair, it was apparent that most careful advance planning would be required to avoid a complete and dangerous traffic breakdown in the area.

Although there were discussions, informal concepts and a crude "plat" showing some possible parking arrangement, as of the date of the hearing, July 20—just 5 days before the proposed holding of the event itself— no lease with the owners of the land had been formalized, and, indeed, Mr. Myer—the consultant retained to plan the physical site—had not so much as visited the site until the evening before the hearing, had made no study of traffic flow in the area of the site, had not read the applicable Health Department Regulations and had made no examination of the area surrounding the site. He thought the site contained 25 acres even though the plat of the site indicated a substantially larger number of acres. Although some tentative arrangements had been made for food and soft drinks, these arrangements appear on their face to be inadequate for the contemplated crowd. The arrangements for "private" policing of the site on July 25 appear to have been inadequate if not

fanciful. In short, the Chancellor could reasonably infer from this lack of planning that conditions at the site on July 25 would most likely be even worse than those described by the officers of the Maryland State Police at other places where rock festivals had been held within approximately a year before July 25, 1970, and at which, in some instances, the prior planning appeared from the testimony including that of Mr. Myer, himself, to have been more complete and definite than the prior planning (or lack of it) for the affair to be held on July 25.

The evidence also showed that, although an agent for the owners had made an inquiry on May 28, 1970, of the Zoning Inspector in regard to a "political" meeting to be held later at the site and was ultimately advised by the Inspector on June 1, 1970, that a zoning certificate would be required under the applicable zoning law, with an offer of help in preparing the necessary application for the certificate, no such application was filed allegedly because local counsel (unnamed) had advised that no such certificate was required. In any event, Section 12.22 of the Worcester County Zoning Ordinance provides:

> " 'Application for a Zoning Certificate shall be made to the Zoning Inspector or coincident with the application for a building permit where such is required. Every application for a Zoning Certificate, whether in connection with a building permit or not, shall be accompanied by a drawing approximately to scale showing the shape and dimensions of the lot to be used or built upon, the size and the location of the lot of every existing building and structure, and its driveways, the existing and intended use of the premises, and of each building or part thereof, and such other information with regard to the lot and its neighboring lots, buildings, and uses, that may be necessary to determine and provide for the administration and enforcement of this Ordinance.' "

The evidence of Dr. Waesche, the Worcester County Health Officer for a number of years, was uncontradicted —that when an application is made for a zoning certificate, a copy is sent to the Health Department for its review and approval or disapproval and that the health officer works with the applicant to work out a reasonable solution to any prima facie violations of the applicable health regulations.

The use of land, *inter alia*, in violation of the zoning ordinance by Section 18.3 is made a crime punishable by both fine and imprisonment. As we have indicated, Section 18.4 provides, among other things, that if land is used or is proposed to be used in violation of the zoning ordinance, the "County Commissioners, the Zoning Inspector or any adjacent or neighboring property owners who would be specifically damaged by such violation," may institute injunction proceedings to restrain such unlawful use or to prevent any illegal act or use in or about the premises.

The zoning ordinance clearly requires the filing of an application for a certificate of zoning for the proposed use of land in this case. The Zoning Inspector testified that Section 13.204 of the zoning law requires a special permit for outdoor meetings such as rock concerts and even religious revival meetings. Air Lift contended below that it would be permitted to hold the rock festival or concert as a recreational or cultural use under Section 6.103 of the zoning ordinance, but, if it be assumed, *arguendo* (and we indicate no opinion on the matter), that this contention was correct, this would not excuse Air Lift from *filing an application* for the zoning certificate. *Agrarian, Inc. v. Zoning Inspector of Harford County,* 262 Md. 329, 277 A. 2d 591 (1971) and *Spintman v. Chesapeake & Potomac Tel. Co.,* 254 Md. 423, 255 A. 2d 304 (1969).

This issue must be determined originally by the zoning authorities. It may not be raised collaterally in an injunction proceeding to restrain a use for which no zon-

ing certificate has been obtained or even applied for by those proposing to engage in a specific use of property prima facie covered by the zoning ordinance. *Agrarian, Inc. v. Zoning Inspector of Harford County,* 262 Md. 329, 277 A. 2d 591 (1971); *Gingell v. Board of County Commissioners for Prince George's County,* 249 Md. 374, 239 A. 2d 903 and *Mayor and City Council of Baltimore v. Shapiro,* 187 Md. 623, 51 A. 2d 273 (1947).

There is no doubt that the site was to be used on July 25 without a zoning certificate inasmuch as the posters, advertisements, and radio broadcasts mentioned in the evidence plainly show this.

The uncontradicted evidence also indicated that the regulations of the Health Department, especially Regulation 43 F 03 in regard to itinerant eating and drinking establishments, required the issuance of a health permit for the proposed event. No such permit had been issued; and, indeed, there had been little, if any, discussion in regard to the proposed event with the Department of Health until the morning of July 20, prior to the beginning of the hearing in regard to the permanent injunction.

Dr. Waesche testified that, in his opinion, without proper provision for potable drinking water, waste removal, and food service, the holding of the proposed rock festival was a potential threat and danger to the public health. There was no testimony, expert or otherwise, to the contrary.

The testimony of the three officers of the Maryland State Police demonstrated that there were no adequate plans by Air Lift and the promoters to meet the large increase in vehicular traffic, that a traffic hazard of substantial proportions would result if the proposed event were held. Their testimony also indicated that, based on the experience of other police forces outside the State and of the State Police within Maryland itself with rock festivals of various kinds, if the proposed rock festival were held at the site, there would likely be a substantial

use of drugs and alcohol with consequent violations of the law, which because of the large, unruly crowd, the police would not be able to stop or to arrest the violators of the law. Their testimony also pointed to the substantial damage to neighboring properties, the destruction of fences, nudity, sexual relations in public and other violations of the law if the proposed event were held at the site.

Similar testimony at the hearing in regard to the issuance of the "Ex Parte" injunction fully justified, in our opinion, the issuance by the Chancellor of that injunction.

### (2)

Air Lift contends that the Chancellor erred in admitting into evidence (a) at the hearing in regard to the Ex Parte injunction, the newspaper clippings attached to the Bill of Complaint in Equity No. 9044; (b) the testimony of Sgt. Rappaport at both hearings; (c) the testimony of Capt. Veditz at both hearings in so far as his testimony was based on the testimony of Sgt. Rappaport or information related to him by others; (d) the testimony of Lt. Col. Randall at both hearings in so far as it is based on the testimony of Sgt. Rappaport or information related to him by others; (e) the testimony of Sheriff Hall; and (f) all testimony based upon a projected attendance of between 30,000 and 50,000 people at the proposed event.

### (a)

Maryland Rule BB72, in regard to Ex Parte Injunctions, provides in paragraph a, as follows:

"Any ex parte injunction shall not be granted unless it appears from specific facts shown by affidavit, or a verified pleading with or without supporting affidavit or sworn testimony, that immediate, substantial and irreparable injury will result to the applicant before an adversary hearing can be had. The judge to whom applica-

tion is made for an ex parte injunction may, in his discretion, communicate informally with the person against whom the injunction is sought, or his attorney, prior to taking action upon the application."

The Chancellor, not only communicated with counsel for Air Lift, but took substantial testimony consisting of 60 printed pages in the Record Extract of Dr. Waesche, Sgt. Rappaport, Capt. Veditz, and Lt. Col. Randall, all of whom were cross-examined by counsel for Air Lift prior to the rendition by the Chancellor of his oral opinion finding various facts and that immediate, substantial and irreparable injury would result to the plaintiffs before a full hearing on the merits could be held if the proposed event were held on July 25. In our opinion, the Chancellor acted with commendable caution and care in being as fully informed as possible, with participation by counsel for Air Lift, before issuing the "Ex Parte" injunction. Indeed, the injunction issued on July 17 was more in the nature of an interlocutory injunction than an "Ex Parte" injunction in view of the adversary aspects of the hearing. See Rule BB 70 c.

During the course of the hearing on July 17, the Chancellor did admit into evidence the newspaper clippings attached to the Bill of Complaint in No. 9044 Equity. These exhibits were stricken from the evidence at the hearing on July 20, the Chancellor stating that he would disregard the newspaper clippings and would not consider them in arriving at a determination of the issues in the case.

If it be assumed, *arguendo,* that it was error to admit the newspaper clippings into evidence at the hearing in regard to the "Ex Parte" injunction, the error was harmless inasmuch as (i) the substance of the newspaper articles was contained in the testimony of the three police officers, who were subject to cross-examination (and were cross-examined) by counsel for Air Lift so that,

at the most, the newspaper articles were merely cumulative and (ii) the hearing on the merits of the perpetual injunction was held three days later on July 20—*five days before* the holding of the contemplated event—and, as we have indicated, the Chancellor struck out the newspaper clippings from the evidence and did not consider them in reaching his decision on the merits. This is a well-established procedure and no prejudicial error results from it. *Trombero v. McWilliams*, 221 Md. 399, 157 A. 2d 801 (1960) ; *State v. Emerson & Morgan Coal Co.*, 150 Md. 429, 133 A. 601 (1926) ; *Stiegler v. Eureka Life Ins. Co. of Baltimore*, 146 Md. 629, 127 A. 397 (1925) ; and *Brotherhood of Locomotive Firemen & Engineers v. Nash*, 144 Md. 623, 125 A. 441 (1924).

## (b), (c), (d) and (e)

The objection to the testimony of Sgt. Rappaport was based on the alleged hearsay nature of information received by him in his official capacity from other identified law enforcement officers in regard to rock festivals or concerts. This information, however, was obtained in the regular course of Sgt. Rappaport's official work. He testified that he prepared written reports for his office in the regular course of his duties based upon what he and his office considered to be reliable information from law enforcement officials who were mentioned in the official publication of Law Enforcement Intelligence Units used throughout the United States and by some law enforcement units in Canada. This official information, which is far from mere conjecture or guess, is part of the data on which Sgt. Rappaport, as an expert, reasonably based his opinion. The trustworthiness of the data would go to the weight of the expert testimony and does not, *per se,* make the expert testimony inadmissible. The competency of an expert to testify is largely within the discretion of the trial court; and, in the absence of an abuse of discretion, we will not disturb the trial court's ruling in this regard. See *e.g., Mondawmin Corp. v. Kres,* 258 Md. 307,

320, 266 A. 2d 8, 15 (1970) and *Continental Ins. Co. v. Kouwenhoven,* 242 Md. 115, 218 A. 2d 11 (1966).

Sgt. Rappaport, in addition to the reports in regard to the rock festivals or concerts outside of Maryland and within the State of Maryland itself, had substantial experience in law enforcement generally, the principles of which would also apply to rock festivals or concerts. The mere fact that Sgt. Rappaport had not personally been involved in a rock festival or concert, as such, would not destroy his competency as an expert witness. As we stated in *Rotwein v. Bogart,* 227 Md. 434, 437, 177 A. 2d 258, 260 (1962):

> "We do not agree entirely with the court's first reason, that the witness could not qualify as an expert in the flooring trade as he had never previously laid a floor. A witness may qualify if he possesses special and sufficient knowledge regardless of whether such knowledge was obtained from study, observation or experience. *Penn., etc., Casualty Ins. Co. v. Messenger,* 181 Md. 295, 29 A. 2d 653. A law professor may be an expert on trial procedure even though he has never tried a case. There are many expert astronauts who have yet to make a space flight."

These same observations also apply to the testimony of the other law enforcement officers who testified.

### (f)

There was, in our opinion, no error in admitting evidence in regard to an estimated attendance of 50,000 persons at the rock festival. Mr. Harrison, one of the owners, testified that the original estimate of the attendance, when negotiations in regard to the lease began, was 50,000 persons. When asked by the Chancellor if he had revised this figure downward or upward since then, Mr. Harrison replied: "I wouldn't know which way to go

with this publicity." This is some evidence that the expected attendance might be larger than the more generally accepted figure of 30,000 and tended to confirm the experience at some other rock festivals of a substantially larger attendance than estimated by the promoters. In any event, this evidence did not prejudice Air Lift inasmuch as the expert and other testimony was based upon an estimated attendance of between 20,000 to 30,000 persons, the latter figure being the one more generally used.

(3)

Although counsel for Air Lift states in Air Lift's brief that it does not contend that the Chancellor "acted with malice or malevolent intent," it does contend that the record shows that the Chancellor "had a preconceived idea of what a rock festival or concert was like and took active steps to insure that this one would not occur."

Our examination of the record does not indicate to us that the Chancellor had a preconceived idea in regard to rock festivals or concerts, but rather that his findings were based upon, and amply supported by, the evidence. The Chancellor was under considerable pressure because of the short time between the filing of the bills of complaint and the date fixed for the holding of the event. In our opinion, he acted with commendable speed, but gave all parties full due process of law in every sense. Air Lift made no motion for a mistrial based upon this contention, so that the point is not preserved for appellate review. See Rule 885; *State Roads v. Creswell,* 235 Md. 220, 201 A. 2d 328 (1964) and *State Roads Commission v. Berry,* 208 Md. 461, 118 A. 2d 649 (1956).

We note, however, that on July 22 when the Chancellor distributed his written opinion in regard to the permanent injunction, counsel for Air Lift stated in open court:

"Counsel: I enjoyed practicing before your Court.

"The Court: Nice to have you, and I hope we aren't ever rushed as badly.

"Counsel: I appreciate your kindness in doing this so that I can get out for my plane."

(4)

We have already set forth the entire order of July 22, 1970, granting the permanent injunction. Paragraphs 1, 3 and 4 of the order are directed specifically at holding the "Rock Festival" on the Home Farm on July 25, 1970; and, for the reasons already stated, we see no error in those paragraphs. Paragraph 2 of the order, however, perpetually enjoins and restrains the defendants from conducting a "Rock Festival," or advertising the same on the site "until plans therefor have been first approved under the provisions of the Worcester County Zoning Ordinance and by the Worcester County, or the State of Maryland, Department of Health, the Sheriff of Worcester County, or the Superintendent of the Maryland State Police, the State Roads Commission of Maryland, if affected by such plans, and the Worcester County Roads Board if affected by such plans."

In our opinion this language—continuing in perpetuity —is not based on compliance with the applicable law, as such, but rather appears to clothe certain officials with the power to "veto," as it were, the holding of a "Rock Festival" at the site.

The Chancellor quite likely did not intend this to be the result of the language used, but this seems to us to be the necessary result of that language. We are mindful also that the opinion and order filed July 22 was prepared under substantial pressure resulting from the tight time schedule and that it is quite understandable that there might well be some imprecise use of language under these circumstances.

This point arises before us in a somewhat unusual manner. Air Lift did not raise the point in its brief and it was, of course, not considered by the appellees in their

brief. Ordinarily, we would treat the point as waived. *Dubrowin v. Schremp*, 248 Md. 166, 235 A. 2d 722 (1967), appeal after remand, 257 Md. 623, 263 A. 2d 827 (1970).

The point, however, was raised at the argument by members of the Court and was argued before us by counsel. Although there apparently is no present interest in conducting a rock festival or concert at the site so that no remand is necessary to have paragraph 2 corrected to conform to our opinion in regard to what it should have contained, in order to "avoid the expense and delay of another appeal to this Court," pursuant to Rule 885, we will express our opinion on this point. If, in the future, there should be any desire by Air Lift to go forward with holding a rock festival or concert at the site, the plaintiffs or the defendants at that time may petition the lower court to amend paragraph 2 of the order in accordance with this opinion; and proceedings may continue thereafter as the situation might warrant at that time.

In our opinion paragraph 2 should have read:

> "2. That the Defendants be and they are hereby perpetually enjoined and restrained from conducting a 'Rock Festival' or 'Rock Concert,' or advertising the same, on the said premises, until they have received a certificate of zoning permitting such use pursuant to the provisions of the Worcester County Zoning Ordinance, if such be required under the provisions of such ordinance, a permit or the approval of either the Worcester County Department of Health or of the State Department of Health as the applicable Health Regulations may require and shall have made adequate provision for proper police protection of those who may be reasonably estimated to attend such proposed event as well as of property adjacent to or near said premises

and for proper traffic control of vehicles used in connection with such proposed event, either by the Defendants or by those reasonably estimated to attend such proposed event."

*Order of July 22, 1970, affirmed in part and reversed in part, as set forth in the aforegoing opinion; the appellant, Air Lift, Ltd., to pay one-half of the costs, the appellee, Board of County Commissioners of Worcester County, to pay one-fourth of the costs and the appellee, the Board of Education of Worcester County to pay the remaining one-fourth of the costs.*