480 A.2d 807

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**
**v.**
**Gary Zane NOTHSTEIN.**
**Misc. (Subtitle BV), No. 15, Sept. Term, 1983.**

Court of Appeals of Maryland.

Aug. 24, 1984.

668

Melvin Hirshman, Bar Counsel, Annapolis, for petitioner.

Andrew Jay Graham, Baltimore, for respondent.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

SMITH, Judge.

In this case we shall disbar an attorney who obtained in excess of $40,000 from his law firm by submitting false expense claims.

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9 on behalf of the Attorney Grievance Commission, filed a petition with us seeking disciplinary action against Gary Zane Nothstein, a member of the Bar of this Court since December 14, 1973. The petition alleged misconduct or "in the alternative that Respondent is incompetent as that term is defined by Rule BV1(h) ...." It was asserted that Nothstein violated Disciplinary Rule 1-102(A)(3), (4), (5) and (6).[1]

---

1. Maryland Rule BV1(h) states:
   " 'Incompetent' means unable to render adequate legal service by reason of mental or physical illness or infirmity, or addiction to or dependence upon an intoxicant or drug."
   Disciplinary Rule 1-102 states in pertinent part:
   "DR 1-102   Misconduct.
   "(A) A lawyer shall not:
   　(1) ...
   　(2) ...
   　(3) Engage in illegal conduct involving moral turpitude.
   　(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
   　(5) Engage in conduct that is prejudicial to the administration of justice.
   　(6) Engage in other conduct that adversely reflects on his fitness to practice law."

## I

Pursuant to Rule BV9(b) we referred the matter for hearing to a judge of the Eighth Judicial Circuit of Maryland. She filed with us comprehensive findings of fact. The factual pattern pertaining to Nothstein's activities is not in dispute. He was an associate and later a partner in a law firm. He apparently lived beyond his means. He was not satisfied with his compensation as an associate or, subsequently, as a partner.[2] He was engaged in writing a text on an aspect of labor law, the profits from which under his agreement with the firm would accrue to the firm. According to his contract with the publishers he was to be reimbursed for expenses only upon completion of the book. He believed, however, that he should be reimbursed sooner. For all of these reasons he conceived and carried out a scheme by which false vouchers for expenses were submitted and he was reimbursed by the firm. Although he asserts that he never at any time intended for clients to be billed for such expenses, some clients were billed, to the embarrassment of the firm. Some of the charges were to fictitious files. Although Nothstein does not contest these factual matters, we observe that there was clear and convincing evidence to support the trial judge's findings.

Evidence before the trial judge consisted of the exhibits before the inquiry panel as well as the transcript; testimony of Dr. Jonas R. Rappeport, Chief Medical Officer of the Circuit Court for Baltimore City, who examined Nothstein at the instance of the Attorney Grievance Commission; and testimony of Nothstein himself.

Dr. Nelson Hendler testified on Nothstein's behalf at the hearing before the inquiry panel. The summary of both psychiatrists' testimony was contained in the report of the trial judge as follows:

---

**2.** That compensation as an associate was in excess of what was paid judges of this Court not many years ago.

"Dr. Nelson Hendler, a licensed physician in the State of Maryland and a certified psychiatrist by the American Board of Psychiatry, first saw the Respondent on October 22, 1982 in his office at Johns Hopkins Hospital. He observed that the Respondent displayed signs of anxiety and reported vegetative signs of depression. He prescribed a course of treatment for the Respondent and has seen his patient at least once a week and sometimes twice a week for a total of approximately 15 times.

\*    \*    \*    \*    \*    \*

"At the hearing, Dr. Hendler testified that, based solely on the information the patient provided and his observations of the patient, the Respondent, because of his various difficulties, was 'experiencing a very severe reactive depression, bordering on neurosis.' The behavior exhibited in his two suicide attempts was 'juvenile-like with retrographic and regressive infantile.' His retaliation against the firm was infantile. Dr. Hendler's ultimate diagnosis was a condition similar to kleptomania. He made an analogy between kleptomania and sociopathic behavior. A thief steals for his own needs and utilizes his gains for those needs. He is usually of a lower socio-economic class and will attempt to cover up his crime and deny guilt. On the other hand, the kleptomaniac is usually well-educated and of a higher socio-economic class. He either has no use for the gains of his theft and applies them to frivolous things, as he believes the Respondent did for the purpose of retaliating against the firm because of a sense of entitlement. These factors are manifestation of kleptomania. Such individuals freely admit guilt and almost want to be punished. Kleptomaniacs act under compulsion and engage in stealing as a way of reducing anxiety, rather than with real criminal intent. Dr. Hendler conceded that there is very little medical material on the subject of kleptomania and that there is no diagnostic term per se for the Respondent's condition. Like other persons who exhibit compulsive behavior, such as those suffering from anorexia nervosa, bulimia, or

pathological gambling, Dr. Hendler believes the Respondent will respond to intense individual psycho-therapy. It was his recommendation that the Respondent be hospitalized immediately after the Inquiry Panel hearing for a month or two followed by therapy for approximately two or three years. He felt that his patient should obtain gainful employment, preferably as an attorney, and, if not, then in a position which would not entail financial responsibilities nor require supervision of his work, since he has difficulty dealing with authority. He also acknowledged the Respondent apparently has a problem with telling the truth, at least with his wife and with authority figures. The Respondent conceded this but avows he is presently truthful.

\* \* \* \* \* \*

"To supplement the Petitioner's case, the testimony of Dr. Jonas Rappeport, Chief Medical Officer of the Medical Office of the Circuit Court for Baltimore City was offered in evidence and a copy of his curriculum vitae was entered as an exhibit. Based on information from a partner at Venable, the Respondent's wife, a review of Dr. Hendler's report and the transcript of the proceedings before the Inquiry Panel, conversations with Dr. Hendler and Dr. Sollod [who saw Respondent in Denver], his interview with the Respondent whereby he obtained a history and performed a mental status examination, Dr. Rappeport formulated a diagnosis of the medical condition of the Respondent.[3] It was his opinion that the Respondent was suffering from a narcissistic personality disorder, in a category of personality disorders which represent a characterological exaggeration of otherwise

---

3. At this point the trial judge inserted her footnote 2. She recognized the objection on hearsay grounds to the opinion of Dr. Rappeport based on information from Mrs. Nothstein who did not testify at any of the proceedings. Among other reasons given for overruling the objection was the statement, "Trend is for admission of such testimony." She cited E. Cleary, *McCormick's Handbook of the Law of Evidence* § 15 (2d ed. 1972).

normal or average human traits to the extent they control individual behavior. He explained that everyone is somewhat obsessed or compulsive. It is necessary in order to be a good lawyer, judge, doctor or court reporter. Such persons are careful, exact and precise. If these traits become exaggerated, the person experiences an illness. These personality illnesses are characterologic; they do not occur suddenly but develop gradually over most of the years of a person's life. Persons who suffer from this narcissistic personality disorder manifest such characteristics as a sense of self-importance, some grandiosity, a pre-occupation with achieving great success, and a tendency toward exhibitionism by showing off, for example by dressing exceptionally well and expensively, because of a need for attention and admiration. Additional manifestations include some indifference to other people's feelings, an inability to relate to other people in a very meaningful manner, some sense of entitlement, a tendency to exploit others in interpersonal relationships, a tendency to see-saw between overidealization of an individual and denigration or devaluation of that individual, and a lack of empathy. It was Dr. Rappeport's belief that the Respondent has displayed these characteristics over his lifetime, which developed in intensity as he grew older. There was no evidence that the Respondent was psychotic at any time or lost the ability to test reality to know what he was doing was wrong. It was Dr. Rappeport's conclusion that the Respondent was aware that what he was doing was wrong. He was aware he shouldn't do it, and although he had a strong desire to do it, nevertheless, in the usual free will concept, he could have stopped, either directly or sought professional help. He was aware of the options. He further explained that although a person may feel compelled to do something, that does not mean he cannot control what he does. It was Dr. Rappeport's belief that if, indeed, the Respondent's basic personality problems can be adequately treated, he would require long term (two, three, four years), regular psychotherapy

preferably of a very intense type (several times a week or at least once or twice a week). Dr. Rappeport doubts anybody truly recovers from such a diagnosis and his prognosis of the Respondent's recovery is guarded. Because the Respondent's condition has developed over a long period of time, it will be very difficult for him to change. While he may be presently motivated to change, Dr. Rappeport believes it will be very hard for the Respondent to maintain his motivation when there isn't a club over his head. Although court imposed conditions may provide motivation in the short run, Dr. Rappeport did not feel the motivation would endure over the long run. The doctor concludes that there is only a twenty-five to thirty-five percent chance that there will be a major change in the Respondent's personality.

"While he questioned whether the Respondent could be trusted in any phase of the practice of law, Dr. Rappeport thinks the Respondent could teach and should work. The fact that the Respondent had been voted best professor by his class is compatible with the diagnosis because the Respondent is a showman and no doubt intelligent. The students would like him. It would be expected for a person with the Respondent's difficulties to be suicidal, that is, to entertain the thought but, Dr. Rappeport would not expect the Respondent to actually commit suicide.

"The doctor finally opined that the Respondent is competent, understands the nature and object of the proceedings against him and can assist counsel in his defense. When advised of the definition of incompetence, set forth in Md. Rule BV1, h, he concurred that the Respondent is probably incompetent within the meaning of the Rule. However, the import of his testimony was not that the Respondent is unable to render adequate legal service because of his mental illness, rather it was that the Respondent is unable to render adequate legal service because he is untrustworthy due to his personality and character."

The trial judge made the following conclusions of law:

"There can be no question that the actions described in this case constitute misconduct within the meaning of DR 1–102(A)(3), (4), (5), and (6). The fact that most of the misdeeds were directed against the law firm of which the Respondent was a member rather than against clients does not ameliorate the conduct. *Attorney Grievance Commission v. Silk,* 279 Md. 345, 347–348 [369 A.2d 70]; *Maryland State Bar Association v. Agnew,* 271 Md. 543, 550 [318 A.2d 811].

"Indeed, the Respondent concedes the acts, in and of themselves, amount to misconduct. He maintains, however, that because of his mental incompetency, he was not able to control his behavior nor form an intent to commit the wrongs. In order to determine whether the Respondent is incompetent within the meaning of Maryland Rule BV1, h, the totality of the evidence must be considered, since the conclusion of the issue of incompetence is a legal one, not a medical one. There is no proof from any source to suggest that the Respondent is unable to form an intent. The only question is whether he is suffering a mental illness which prevents him from being capable of controlling his conduct. In this regard, it is concluded that the opinion of the Petitioner's expert is the sounder of the two, although both impart a sense of two trains on separate tracks coming into the same station. Basically, the two agree that the Respondent's personality traits contributed to the commission of the cited improprieties. The principal divergence is whether his mental condition prevented him from being able to master his activity. The proof offered by the Respondent was not clear and convincing that he was so mentally ill that he could not control his conduct. *Attorney Grievance Commission v. Burka,* 292 Md. 221 [438 A.2d 514]. The reasoning of the Petitioner's expert witness is more credible. Weighing his opinion together with all of the other evidence produced leads to the conclusion that the Respondent had the capacity to control his behavior and, therefore, is not

incompetent within the language and intent of Maryland Rule BV1, h."

Nothstein excepts to the trial judge's finding that he "was able to control himself with regard to the acts upon which the charges were based." He objects to the fact that the judge "elected to rely exclusively upon the testimony of the State's [sic] expert, Dr. Jonas R. Rappeport." This objection is based on the fact that "Dr. Rappeport was not the respondent's treating physician, and had not spent as much time with the respondent as had the treating physician, namely, Dr. Nelson Hendler" and on the fact that "Dr. Rappeport's opinion was based in part on inadmissible hearsay, to which the respondent objected at the hearing."

Nothstein further excepts to the finding that he "was unable to render adequate legal service not because of mental illness," but because "he is untrustworthy due to his personality and character." Further exception is taken to the conclusion of law that his actions constituted misconduct within the meaning of DR 1–102(A)(3), (4), (5) and (6), it being asserted that "[t]he totality of the evidence adduced at the Inquiry Panel hearing and the hearing before the trial court, which considered all of the evidence adduced at the panel hearing, showed that the respondent was not in control of his actions during the time period when he engaged in a reckless scheme which was bound to fail and which had to have the ultimate consequence of destroying the scheme's perpetrator." Nothstein recommends that we "not disbar or otherwise punish him for willful or intentional violations of the Disciplinary Rules, but rather find that he was incompetent to practice law and that he should be placed on inactive status until such time as approved medical experts certify to [us] that [he] has recovered from his mental and emotional disorder to such an extent that he is competent to practice law."

## II

We first consider Nothstein's contention that "Dr. Rappeport's opinion was based in part on inadmissible hearsay, to which the respondent objected at the hearing,"

because elimination of that opinion, upon which the trial judge relied, would undermine certain findings of the trial judge.

At the hearing Dr. Rappeport indicated that he had before him a large packet of material consisting of the transcript of the hearing before the inquiry panel which included the testimony of Dr. Hendler and a packet of correspondence from Dr. Hendler. He further said that one of his assistants interviewed Mrs. Nothstein and another had talked with one of the partners of the law firm with which Nothstein was connected. When Dr. Rappeport was asked to give his opinion of the mental condition of Nothstein counsel immediately said he "would object to the opinion being rendered on the grounds as being rendered on matters that are not in evidence, and that are hearsay. For example, statements by Mr. Nothstein's wife." At this point the trial judge asked Dr. Rappeport upon what he based his opinion. He replied:

"I believe, Your Honor, on all of the material that I had available to me. I would not want to completely try to eliminate the additional information of Dr. Maktari [who interviewed Mrs. Nothstein]. I might have obtained it myself, but it was more convenient to have him obtain it, that is, to interview Mrs. Nothstein merely to verify and confirm some things that we believe existed, and some things that I had some question about, the conclusions of [sic] Dr. Hendler had made. He had made certain conclusions from information Mr. Nothstein had given him, and based, it seemed, his opinion on that. And I believed that those conclusions were not accurate. I therefore decided as one does in forensic work to obtain as much additional information as we could by speaking to family and friends and what have you. It was not necessary to go further than to get some information from Mrs. Nothstein. I think that, I probably would have formed the same diagnosis without that information but be less sure of it. So I think that was an integral part."

The trial judge overruled the objection. Each time Dr. Rappeport was asked for an opinion the objection was renewed.

In considering this problem it is important to bear in mind that Dr. Rappeport said as to his procedure he "decided as one does in forensic work ...."

It will be noted that in her memorandum the trial judge recognized the objection that had been raised to the admission of the Rappeport opinion. She said, "Trend is for admission of such testimony" and cited E. Cleary, *McCormick's Handbook of the Law of Evidence* § 15 (2d ed. 1972). That work in discussing the opinion of experts based upon reports of others states:

"The essential objection seems to be that the jury is asked to accept as evidence the witness' inference, based upon someone's hearsay assertion of a fact which is, presumably, not supported by any evidence at the trial and which therefore the jury has no basis for finding to be true. Moreover, want of the knowledge-qualification may be asserted. Should these objections still prevail when the witness is asked to give a similar direct (not hypothetical) opinion, on the basis not merely of reports of this kind, but of these reports supplemented by the witness' own observation of the person or situation in question? Probably many courts would apply the same reasoning, and exclude the evidence under a variety of circumstances, but there is a strong trend toward a contrary view. It is reasonable to assume that an expert in a science is competent to judge the reliability of statements made to him by other investigators or technicians. He is just as competent indeed to do this as a judge and jury are to pass upon the credibility of an ordinary witness on the stand. If the statements, then, are attested by the expert as the basis for a judgment upon which he would act in the practice of his profession, it seems that they should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand, and this argument is reinforced

when the opinion is founded not only upon reports but also in part upon the expert's first-hand observation. The data of observation will usually enable the expert to evaluate the reliability of the statement." *Id.* at 34–36.

3 J. Wigmore, *Evidence in Trials at Common Law* § 688 (Chadbourn rev. 1970) states:

"As to hearsay *symptoms told by third persons,* a diagnosis based on sundry information from third persons in general has no claims for admission.

"But where the information is that of an *attending nurse or physician* having personal observation and an interest in learning and describing accurately, there seems every reason for admitting testimony based in part on this. Every physician relies upon it, and there are periods of sleep or other unconsciousness or mental incapacity which make it impossible to resort to the patient for information. It should be immaterial whether the informant is a professional person or is the wife or other member of the household so long as the information is based on attendance and personal observation." *Id.* at 9–10 (emphasis in original).

D. Binder, *Hearsay Handbook* (2d ed. 1983) states on this subject:

"The federal courts and a majority of state courts permit an expert witness to express an opinion that is based, in part, on hearsay of a kind that is customarily relied on by experts in that particular business, profession, or occupation. However, the hearsay itself is not admissible as substantive evidence. It is only admissible to explain the basis of the expert's opinion. In other words, the trier of fact is allowed to give credence to an expert's opinion that is based on the assumption that certain hearsay is true, but is not allowed to give credence to the hearsay itself." *Id.* at 451.

Fed.R.Evid. 703 provides concerning bases of opinion testimony by experts:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

*See also* Annot., 55 A.L.R.3d 551, 557–58 § 4 (1974), Annot., 12 A.L.R.3d 1064, 1067–1076 § 3 (1967).

Maryland applied such a rule early in this century. In *Baltimore City v. Hurlock*, 113 Md. 674, 78 A. 558 (1910), an expert witness was called to testify in a tax assessment case as to the value of certain real estate. Objections on hearsay grounds were entered to his testimony as to sales, leases, and mortgages upon property in that neighborhood, information derived from an inspection of land records, and information as to sales, leases, or mortgages in the neighborhood "derived personally from the vendors, vendees, lessors, lessees, mortgagors or mortgagees themselves, other than the petitioner in th[at] case." 113 Md. at 681, 78 A. at 561. In holding that the trial court erred in excluding the evidence in question, the Court stated:

"Mr. Wigmore says, Vol. 1 sec. 562: 'An expert witness, like any other witness, may be asked *on direct examination, or may be required* to state the grounds of his opinion, *i.e.*, the general data which form the basis of his judgment upon the specific data observed by him. This is merely an application of the general principle of the knowledge qualification. * * * The party offering a witness may desire to make plain the strength of the witness' ground of knowledge, and the reasons for trusting his belief. This is a legitimate purpose. * * * The general rule is that the witness may, on the direct examination, state the particular circumstances which legitimately affected his knowledge or recollection, *even though the fact would be otherwise inadmissible.* The judges' instruction to the jury must be relied on for

preventing their improper use of the fact.' " 113 Md. at 683, 78 A. at 561–62 (emphasis in original).

The combination of 2 Wigmore, *op. cit.,* §§ 562 and 655 (rev. 1979) today contain language identical to that quoted in *Hurlock.* The rule was applied by the Court in *Baltimore & O.R.R. v. Hammond,* 128 Md. 237, 242, 97 A. 532, 534 (1916), relative to an expert's opinion as to the value of real estate.

In *Air Lift, Ltd. v. Bd. of Co. Comm'rs,* 262 Md. 368, 278 A.2d 244 (1971), we were concerned with the propriety of an injunction against conducting a rock festival or concert. The decision of the chancellor rested, among other bases, upon evidence adduced by a sergeant of the Maryland State Police. The Court said:

"The objection to the testimony of Sgt. Rappaport was based on the alleged hearsay nature of information received by him in his official capacity from other identified law enforcement officers in regard to rock festivals or concerts. This information, however, was obtained in the regular course of Sgt. Rappaport's official work. He testified that he prepared written reports for his office in the regular course of his duties based upon what he and his office considered to be reliable information from law enforcement officials who were mentioned in the official publication of Law Enforcement Intelligence Units used throughout the United States and by some law enforcement units in Canada. This official information, which is far from mere conjecture or guess, is part of the data on which Sgt. Rappaport, as an expert, reasonably based his opinion. The truthworthiness of the data would go to the weight of the expert testimony and does not, *per se,* make the expert testimony inadmissible. The competency of an expert to testify is largely within the discretion of the trial court; and, in the absence of an abuse of discretion, we will not disturb the trial court's ruling in this regard." 262 Md. at 401, 278 A.2d at 261.

In *Consol. Mech. Contractors v. Ball,* 263 Md. 328, 339, 283 A.2d 154, 159 (1971), we held admissible evidence from

a vocational rehabilitation expert who testified as to his opinion of a plaintiff's capabilities based on various doctors' reports and tests. In the course of that opinion Judge McWilliams said for the Court:

"It is generally true that the opinion of an expert may not be based in whole or in part on the opinions, inferences and conclusions of other witnesses, *Jackson v. Jackson*, 249 Md. 170 [238 A.2d 852] (1968); *Mt. Royal Cab Co. v. Dolan*, 168 Md. 633 [179 A. 54] (1935); *Quimby v. Greenhawk*, 166 Md. 335 [171 A. 59] (1934), nor on reports and examinations of others if they contain only opinions, inferences or conclusions. *Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger*, 181 Md. 295 [29 A.2d 653] (1943); *Equitable Life Assur. Soc: v. Kazee*, 257 Ky. 803, 79 S.W.2d 208 (1934); *Robertson v. Coca Cola Bottling Co.*, 195 Or. 668, 247 P.2d 217 (1952). *See also* 2 Wigmore, *Evidence* § 657 (3d ed. 1940); *McCormick on Evidence* § 15 (hornbook series 1954); 31 Am.Jur.2d *Expert and Opinion Evidence* § 42 (1967); 19 A.L.R.3d 1008. But it is true also that an expert witness who has heard the entire testimony in a case and who assumes the truth of it all, where it is not conflicting, may base his opinion upon *facts* testified to by other witnesses, or upon *facts* contained in reports or examinations made by third parties. *Wilhelm v. Burke*, 235 Md. 412 [201 A.2d 835] (1964); *State ex rel. Solomon v. Fishel*, 228 Md. 189 [179 A.2d 349] (1962); *Ihrie v. Anthony*, 205 Md. 296 [107 A.2d 104] (1954); *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse*, 187 Md. 375 [50 A.2d 256] (1946); *Langenfelder v. Thompson*, 179 Md. 502 [20 A.2d 491] (1941). Admittedly it is often hard to draw the line between fact and opinion. The usual objection seems to be based on the premise that hearsay will be the foundation of the opinion. While there is considerable authority to the contrary we think there is support for the view that such opinion evidence, in some circumstances, may be admissible, for instance where such reports are relied on by the expert in the practice of

his profession. *See McCormick on Evidence* § 15 (hornbook series 1954), and 3 Wigmore, *Evidence* § 688 (Chadbourn rev. 1970)." 263 Md. at 335–36, 283 A.2d at 157–58 (emphasis in original).

We have not had occasion to consider the matter since *Ball.* Similar rulings are to be found, however, in opinions of the Court of Special Appeals. *See, e.g., Cohen v. Rubin,* 55 Md.App. 83, 98, 460 A.2d 1046, 1054 (1983) (officers testified as accident reconstruction experts basing opinion on information received from others); *Bullis School v. Justus,* 37 Md.App. 423, 436–38, 377 A.2d 876, 883–84 (1977) (vocational rehabilitation expert testified based on report from nontreating physician); *O'Connor v. Plotkins, Inc.,* 32 Md.App. 329, 338, 362 A.2d 95, 100 (1976) (report of expert which referred to opinions or conclusions of others admitted following testimony); *Madden v. Merc.-Safe Dep. & Tr. Co.,* 27 Md.App. 17, 43–46, 339 A.2d 340, 355–57 (1975) (court declined to permit testimony of an expert as to value of Pimlico Race Track based on reports of others because the reports in that instance were not reliable, stating, "Where an expert relies on reports of others, he must demonstrate to the court not only that the reports were made in a reliable manner, but that they are reliable sources of information for the purposes to which expert puts them."). 27 Md.App. at 44, 339 A.2d at 356.

In *United States v. Williams,* 447 F.2d 1285 (5th Cir. 1971) (en banc), the court said:

"[T]he opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and from a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

\*    \*    \*    \*    \*    \*

" . . . [A]n expert's testimony need not be based solely upon records which are themselves introduced in evidence so long as the sources of information are of a type reasonably relied on by experts in forming opinions or inferences upon the subject." 447 F.2d, at 1290–91. It will be noted that *Williams* was decided before adoption of the Federal Rules of Evidence. The court noted that its decision was in accord with the proposed rule. The rule as proposed differs from Fed.R.Evid. 703 only by use of the word "upon" rather than "on" and the insertion in the adopted rule of the language "in the particular field."

Dr. Rappeport stated that in obtaining the hearsay information he "decided as one does in forensic work . . . ." We perceive him to have relied upon a type of information reasonably relied upon by experts in his particular field in forming opinions upon the subject. Given our own prior cases and the rule elsewhere as we have here set it forth, we find no error on the part of the trial judge in admitting Dr. Rappeport's opinion based in part on hearsay.

## III

▪▪▪ Nothstein excepts to the fact that the trial judge "elected to rely exclusively" upon the testimony of Dr. Rappeport. It is elementary that a trier of fact may elect to pick and choose which evidence to rely upon. *See Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 354, 420 A.2d 940, 946 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981); *Clemson v. Butler Aviation,* 266 Md. 666, 671–72, 296 A.2d 419, 422 (1972); *Davidson v. Katz,* 254 Md. 69, 80, 255 A.2d 49, 54 (1969); *Racine v. Wheeler,* 245 Md. 139, 144, 225 A.2d 444, 447 (1967). The trial judge was free to choose to rely on Dr. Rappeport.

## IV

We shall consider together Nothstein's exception to the trial judge's finding that he "was able to control himself with regard to the acts upon which the charges were

based," her finding that "he is unable to render adequate legal services [not] because of mental illness" but because "he is untrustworthy due to his personality and character," and her conclusion of law that his actions constitute misconduct within the meaning of DR 1–102(A)(3), (4), (5), and (6). As previously indicated, it is asserted in connection with the latter exception that "[t]he totality of the evidence adduced at the Inquiry Panel hearing and the hearing before the trial court, which considered all the evidence adduced at the panel hearing, showed that the respondent was not in control of his actions during the time period when he engaged in a reckless scheme which was bound to fail and which had to have the ultimate consequence of destroying the scheme's perpetrator."

Obviously, Nothstein is fighting to avoid disbarment. He seizes upon cases in which we have directed that attorneys be indefinitely suspended because of their problems related to alcohol or other mental conditions. *See Attorney Griev. Comm'n v. Truette*, 299 Md. 435, 474 A.2d 211 (1984); *Attorney Griev. Comm'n v. Willemain*, 297 Md. 386, 466 A.2d 1271 (1983); *Attorney Griev. Comm'n v. Dunphy*, 297 Md. 377, 467 A.2d 177 (1983); *Attorney Griev. Comm'n v. Finlayson*, 293 Md. 156, 442 A.2d 565 (1982); *Attorney Griev. Comm'n v. Willcher*, 287 Md. 74, 411 A.2d 83 (1980); *Attorney Griev. Comm'n v. Flynn*, 283 Md. 41, 387 A.2d 775 (1978). In each of those cases it was found that the attorney's mental condition or addiction to alcohol impeded him from conducting his practice. In each of those cases there was a finding by the trier of fact that the addiction to alcohol or the other mental condition was to a substantial degree responsible for the conduct of the attorney.

The trial judge in her opinion relied upon *Attorney Griev. Comm'n v. Burka*, 292 Md. 221, 438 A.2d 514 (1981), a case where we declined to find an attorney's mental condition to be responsible for his misconduct. Burka sought to reduce the recommended sanction of disbarment, claiming as a compelling extenuating circumstance that he had a neurosis. We looked at the facts and found the misconduct to be

limited to a particular case and thus not affecting his entire practice. Judge Cole said for the Court:

"Burka waited four years from the point of his misconduct to the time he sought professional advice. During this period his mishandling of the Leonard Estate was apparently the only instance where his mental condition interfered with the conduct of his practice. Restricting the time frame even further to the period when Burka alleges he was acting under the stimulus of this mental malady, Burka withdrew funds fifteen times over a seven month period from the estate account yet did not mishandle any of the other affairs entrusted to his care. We find that this selective influence of his neurosis, plus his ability to manage his practice throughout the four year period, to be cogent evidence that Burka was not forced by his mental condition to perform these acts." 292 Md. at 226, 438 A.2d at 517.

■ During the period of Nothstein's misconduct he not only carried on a practice without any problems insofar as the record shows, but at the same time wrote a treatise on an aspect of labor law for a national publisher. We cannot say that the trial judge was clearly in error when she concluded that "[t]he proof offered by the Respondent was not clear and convincing that he was so mentally ill that he could not control his conduct." It will be recalled that she found the reasoning of Dr. Rappeport to be "more credible." We overrule this series of exceptions.

## V

In *Attorney Griev. Comm'n v. Lockhart,* 285 Md. 586, 403 A.2d 1241 (1979), we said:

"Many times in recent years this Court has quoted from *Ex Parte Brounsall,* 2 Cowp. 829 (1778), what has come to be known as 'the Lord Mansfield rule.' It is to the effect that in disciplinary proceedings the inquiry is to whether after the conduct of such individual it is proper that he should continue to be a member of a profession

which should stand free from all suspicion, such proceedings not being by way of punishment, but the court in such cases exercises its discretion whether a man whom they have formerly admitted to practice is a proper person to be continued on the roll or not." 285 Md. at 596–97, 403 A.2d at 1247.

To similar effect see, among others, *Mandel*, 294 Md. at 588, 451 A.2d at 923; and *Kerpelman*, 288 Md. at 381–82, 420 A.2d at 959.

■ The public interest is protected when we discipline an attorney since it demonstrates both to the public and to the legal profession the type of conduct on the part of officers of this Court which we will not tolerate without sanction.

■ In *Maryland St. Bar Ass'n v. Agnew*, 271 Md. 543, 318 A.2d 811 (1974), Judge Digges said for the Court, "[W]e see no significant moral distinction between willfully defrauding and cheating for personal gain a client, an individual, or the government." 271 Md. at 550, 318 A.2d at 815. He went on to say for the Court:

"[T]his Court has consistently adhered to the view, both prior to 1970 (when we reviewed disciplinary actions only on appeal at the instance of the respondent-attorney), *Balliet v. Balto. Co. Bar Ass'n,* [259 Md. 474, 270 A.2d 465 (1970)]; *Fellner v. Bar Ass'n,* [213 Md. 243, 131 A.2d 729 (1957)]; *In the Matter of Lombard,* 242 Md. 202, 218 A.2d 208 (1966); *In Re Williams,* 180 Md. 689, 23 A.2d 7 (1941); and since that date (when we assumed original and complete jurisdiction over these proceedings), *Bar Ass'n v. Marshall,* [269 Md. 510, 307 A.2d 677 (1973)]; *Bar Ass'n v. Cockrell,* 270 Md. 686, 313 A.2d 816 (1974); *Maryland St. Bar Ass'n v. Callanan,* 271 Md. 554, 318 A.2d 809 (1974), that when a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, deceit, cheating or like conduct, absent the most compelling extenuating circumstances, not shown to be present here, disbarment followed as a matter of course.

To do other than disbar the respondent in this case, therefore, would constitute a travesty of our responsibility." 271 Md. at 553, 318 A.2d at 816–17.

To similar effect see, *Attorney Griev. Comm'n v. Woodward*, 299 Md. 429, 435, 474 A.2d 208, 211 (1984); *Mandel*, 294 Md. at 587–88, 451 A.2d at 923; *Attorney Griev. Comm'n v. Noren*, 293 Md. 611, 614, 446 A.2d 423, 424 (1982); and *Attorney Griev. Comm'n v. Spector*, 293 Md. 324, 328–29, 443 A.2d 965, 967 (1982).

It follows that Nothstein must be disbarred.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GARY ZANE NOTHSTEIN.