## In re Anonymous No. 32 D.B. 89

Disciplinary Board Docket No. 32 D.B. 89.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania,

LIEBER, *Member,* February 14, 1992—Pursuant to Rule 208(d), Pa.R.D.E., the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

### HISTORY OF PROCEEDINGS

On April 11, 1989, the Office of Disciplinary Counsel (petitioner) filed a petition for discipline against attorney [ ] (respondent), charging him with professional misconduct in violation of the Code of Professional Responsibility, 204 Pa. Code 81. The seven-count petition alleged that from January 1984, until August 1987, respondent commingled, converted and otherwise misused for his own use approximately $7,500 in fees intended for and belonging to the law firm where he was employed as a non-shareholder associate. Specifically, the petition for discipline averred that respondent violated the following Disciplinary Rules:

(1) Disciplinary Rule 1-102(A)(3), which prohibits a lawyer from engaging in illegal conduct involving moral turpitude;

(2) Disciplinary Rule 1-102(A)(4), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; and

(3) Disciplinary Rule 1-102(A)(6), which prohibits a lawyer from engaging in any other conduct that adversely reflects on his fitness to practice law.

Respondent filed an answer to petition for discipline. He admitted that he had violated Disciplinary Rules 1-102(A)(4) and (6), but denied that the admitted misconduct involved a violation of Disciplinary Rule 1-102(A)(3). In his answer, respondent raised as new matter a request that the Hearing Committee combine the issues of violations and discipline into a single disciplinary hearing pursuant to Disciplinary Board Rule 89.151.

Respondent offered the testimony of a psychiatrist to establish that a mental and emotional dysfunction had affected his judgment and contributed to his misconduct. He offered this testimony as mitigating evidence. See, *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989). Respondent contended before the Hearing Committee that the proper sanction would be probation in accordance with Disciplinary Board Rule 89.291.

Pursuant to respondent's request, Hearing Committee [ ] held a combined hearing on the issues of violations and discipline on July 26, 1989, and October 6, 1989. The committee consisted of [ ]. Respondent submitted psychiatric testimony from [A], M.D. to the effect that he suffered from a personality disorder classified in the *Diagnostic and Statistical Manual of Mental Disorders,* third edition (revised), (hereinafter *DSM*-III-R)

published by the American Psychiatric Association. In addition, respondent testified on his own behalf and produced three character witnesses.

Petitioner's evidence included a stipulation of fact, testimony from partners in respondent's former law firm, and rebuttal psychiatric testimony from [B], M.D. Dr. [B] did not dispute Dr. [A's] use of the *DSM*-III-R classification and opined that respondent suffered from a "passive-aggressive personality disorder," a condition Dr. [B] characterized as a character defect.

Both parties submitted briefs following the hearing. Respondent's brief addressed the subject of mitigation. Petitioner's brief focused on the issue of appropriate discipline and recommended disbarment or a lengthy suspension.

On May 25, 1990, the Hearing Committee filed its report and recommendation. The committee found that the evidence was sufficient to establish that respondent had violated Disciplinary Rules 1-102(4) and (6). In light of his diagnosed condition, however, the committee failed to find the evidence sufficient to show that he had violated Disciplinary Rule 1-102(A)(3). The committee concluded that respondent's mental disorder should be considered a mitigating factor under *Braun* and recommended probation for a period of three years conditioned on completion of his psychiatric counseling program and payment of expenses. The committee recommended that any suspension required under Disciplinary Board Rule 89.291 be stayed in whole.

Petitioner filed a brief on exceptions to the report and recommendation of the Hearing Committee on June 14, 1990, objecting to the committee's findings of disability and recommendation for probation. Petitioner further argued that respondent had demonstrated moral turpitude by his intentional misconduct.

On July 5, 1990, respondent filed a brief opposing ODC's exceptions to report and recommendation of Hearing Committee [   ]. Respondent urged the Disciplinary Board to affirm the Hearing Committee's findings of fact and recommendation and to conclude that the record clearly and convincingly established that his misconduct had been caused by a personality disorder which was amenable to treatment. He asked the board to adopt the committee's findings of fact, conclusions of law and recommended discipline of three years' probation under Rule 89.291 conditioned on continued psychiatric counseling.

## FINDINGS OF FACT

The board makes the following findings of fact.

(1) The stipulation of the parties, which is attached as Appendix A hereto, is accepted and incorporated in total as though fully set forth herein.

(2) The findings of fact of the Hearing Committee is accepted and incorporated as follows.

(3) From in or about 1982 through 1987, respondent received an increase in salary each year.

(4) From in or about 1982 through 1987, respondent received a bonus each year.

(5) In 1986, respondent received a $10,000 increase in salary from $25,000 to $35,000 for the year 1987.

(6) From approximately 1982 through March 1988, respondent suffered from a personality disorder, either narcissistic, passive-aggressive or both.

(7) Respondent's personality disorder interfered with his functioning as an attorney and contributed to the commission of his misconduct.

(8) Immediately after being confronted by the firm with the diversion of the fee paid by one of the clients,

respondent admitted his misconduct with respect to that case and the others. Subsequently, he entered into an agreement for restitution with the firm and has made complete restitution to the firm in the amount of $7,500 for all fees improperly retained by him during the period of his employment.

(9) In March 1988, respondent was referred to [A], M.D. a practicing psychiatrist and professor of psychiatry at the University of [ ] Medical School.

(10) Since March 1988, respondent has seen Dr. [A] on a regular basis (usually weekly) and has made substantial progress in improving his self-image, tolerating tension, maturing and increasing his acceptance of reality.

(11) In the opinion of both expert witnesses, it is unlikely that there would be any repetition of professional misconduct.

(12) There is no evidence that respondent did not properly and effectively perform legal representation of clients during the period in question, including the seven clients whose fees were diverted.

(13) Since August 1987, respondent has successfully engaged in the private practice of law in [ ], Pennsylvania and has not been involved in any misconduct.

(14) Respondent has no prior disciplinary record.

(15) Respondent's reputation in the community is that he has excellent character.

## DISCUSSION

The matter presently before the Disciplinary Board involves the appropriate discipline for a lawyer with a medically diagnosed personality disorder who engages in misconduct in which his mental dysfunction is a causal factor. The Supreme Court of Pennsylvania has

held that where the record supports the finding that psychiatric illness was a factor in causing the professional misconduct, it may be considered in mitigation of discipline. *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894, 895 (1989).

There is no question respondent produced evidence on the record that his personality disorder was a factor in causing his admitted egregious misconduct. The medical testimony submitted to the Hearing Committee clearly establishes a mental dysfunction causally related to respondent's conversion of fees. His psychiatrist, Dr. [A], testified that when he first met respondent, he saw an anxious, worried man with a mixed self-image. Subsequent psychological tests revealed that respondent's personality was composed of "disparate elements, poorly integrated and often contradictory," with inner contradictions characteristically covered by avoidance, denial and repression. According to Dr. [A], respondent had a "marked need for nurturance and even narcissistic gratification" that could lead to depressive moods and impulsive behavior if ungratified. Although respondent was admittedly able to function, he suffered from considerable internal chaos. Respondent retaliated against his law firm because he felt underpaid, unappreciated and overworked. His misconduct, in Dr. [A's] opinion, was in no way motivated by a desire to steal, but resulted from an immature personality disorder of the narcissistic variety.

When asked whether respondent's destructive behavior was caused by his disorder, Dr. [A] responded: "Very definitely. I believe the misappropriation of funds is greatly the result of the kind of psychological illness he had, [the] narcissistic personality disorder to which I have testified." Dr. [A] referred to *DSM-III-R* wherein respondent's mental disorder is classified,

and expressed confidence, to a medical certainty, that respondent would not commit such thefts again.

Petitioner presented rebuttal testimony from another psychiatrist, Dr. [B], who made the same diagnostic evaluation: respondent had a passive-aggressive personality disorder. Dr. [B] agreed that the symptoms of his personality disorder had interfered with respondent's functioning in his career, job and life. When asked whether respondent's dysfunction had contributed to the misconduct, Dr. [B] responded in the affirmative: "Without that he would have chosen a different route of handling his feelings of disappointment, of inadequacy, of rejection." Dr. [B] did not dispute Dr. [A's] use of the *DSM*-III-R classification, noting that he shared Dr. [A's] evaluation of the general nature of the disorder and its causal connection to the misconduct. He, too, did not think the misconduct would recur.

With both experts testifying that respondent suffered from a clinically recognizable personality disorder which was a factor in causing his professional misconduct, the *Braun* test is satisfied. The Hearing Committee was thus persuaded, as are we, that the clear and convincing medical record in this case meets that standard.

*Braun* authorizes consideration of psychiatric disorder as a mitigating factor in a disciplinary proceeding where the attorney's mental condition was a causal factor in producing the professional misconduct. *Braun*, 553 A.2d at 895-96. The term "psychiatric illness" in *Braun* is not restricted to a preordained level of severity or type of mental disorder. Respondent's personality disorder is documented in *DSM*-III-R at 301.81, where various diagnostic criteria characteristic of a narcissistic personality disorder are described. The characteristics

enumerated therein include: disturbances in interpersonal relationships; feelings of special entitlement; extreme self-centeredness and self-absorption; self-importance; and interpersonal exploitiveness with disregard for the personal integrity and rights of others. *DSM-III-R*, 301.81 at 315.16. The testimony of both Dr. [A] and Dr. [B] corroborates that respondent suffered from the above personality disorders, which when described as "immature" must be understood as a term of art encompassing medically sound diagnostic criteria.

The Supreme Court of Pennsylvania historically has taken a harsh view of professional misconduct involving theft or commingling of client funds. In most instances, the court has held that such misconduct warrants disbarment. *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 472 A.2d 186 (1983); *Office of Disciplinary Counsel v. Knepp*, 497 Pa. 396, 441 A.2d 1197 (1982); *Office of Disciplinary Counsel v. Lewis*, 493 Pa. 519, 426 A.2d 1138 (1981); *In re Leopold*, 469 Pa. 384, 366 A.2d 227 (1976). Nevertheless, the court has declined to impose a per se rule requiring disbarment for any attorney who misappropriates clients' funds, preferring instead to decide each case on the totality of the facts present. *Lucarini*, 472 A.2d at 190. Where, as in *Braun*, those facts demonstrate a medically diagnosed psychiatric illness causally related to the theft, consideration of mitigating circumstances is appropriate.

Respondent proposes that we regard his misconduct as less egregious because he stole from his law firm and not from his clients. We reject that argument in accord with other jurisdictions which have considered instances of similar misconduct. See, *In re Disciplinary Action Against O'Hagan*, 450 N.W.2d 571 (Minn. 1990) (theft from law firm's trust accounts warrants disbar-

ment); *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988) (misappropriation of law partnership funds warrants disbarment though attorney suffers from mental disorder characterized as mixed personality disorder); *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 480 A.2d 807 (1984) (disbarment appropriate where attorney defrauded his law firm).

In this case, however, there are various other factors present which we find proper to consider in mitigation. While we are mindful of the gravity of respondent's misconduct, we must also consider the primary function of the disciplinary system—which is to determine the fitness of an attorney to continue to practice of law. *Lucarini,* 472 A.2d at 190. See also, *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975).

Respondent's youth, his lack of a prior disciplinary record, his cooperation and restitution in full are all persuasive mitigating factors. In addition, respondent has sought and successfully undergone psychiatric counseling. Both Dr. [A] and Dr. [B] have testified that they do not anticipate any recurrence of his misconduct, and they both expressed optimism about his progress and rehabilitation. Neither psychiatrist characterized respondent's misconduct as motivated by dishonesty, a quality which if present would negate his fitness to practice law.

In consideration of the above mitigating factors, and pursuant to the court's holding in *Braun,* we conclude that respondent should be suspended from the practice of law for a period of three years. This discipline, which is appropriate in light of the record establishing a medically documented personality disorder, should

come as no surprise to Disciplinary Counsel who requested either disbarment or a "lengthy suspension."

## RECOMMENDATION

Accordingly, the Disciplinary Board respectfully recommends to the Supreme Court of Pennsylvania that respondent be suspended from the practice of law for a period of three years. It is further recommended that the court direct respondent to pay all necessary expenses incurred in this proceeding pursuant to Rule 208 (g)(1), Pa. R.D.E.

Mr. Hill dissents and would recommend disbarment.

Mr. Eckell and Ms. Heh did not participate in this adjudication.

## *APPENDIX*

(1) Respondent is an attorney admitted to practice law in the Commonwealth of Pennsylvania, having been admitted on or about October 27, 1982.

(2) Respondent maintains his principal office for the practice of law at [ ].

(3) Respondent worked as a non-shareholder associate for the firm of [C], P.C., located at [ ] from in or about June 1982, until in or about August 1987.

(4) As an associate non-shareholder, respondent had a duty to remit all fees received from clients to [C].

(5) Respondent knew he had a duty to remit all fees received from clients to [C].

(6) From in or about January 1984, until in or about August 1987, respondent received, as described herein below in greater detail, in addition to other fees, approximately $7,500 in fees from various clients and failed to remit to [C], the $7,500, which he received in fees.

(7) Respondent commingled, converted and otherwise misused funds belonging to and/or intended for [C] for his own purposes.

## CHARGE I

(8) In or about December 1986, [D] was arrested on charges of burglary in [ ] County, Pennsylvania.

(9) In or about December 1986, [D] and his mother, [E], met with respondent in his office at [C] in [ ], Pennsylvania.

(10) Respondent agreed to represent [D] in respect to the burglary charges filed against him.

(11) Respondent requested a fee in the amount of $5,000.

(12) [E] gave respondent and he accepted $500 in cash as partial payment of his fee.

(13) Respondent failed to remit the $500 which he received from [E] to [C].

(14) Thereafter, respondent represented [D] at his hearing before District Justice [F] in [ ].

(15) [E] paid $1,500 in cash to Justice [F] as bail for [D].

(16) On or about January 12, 1987, [E] and [D] met with respondent again in his office at [C] in [ ], Pennsylvania.

(17) During the aforesaid meeting, [E] gave respondent and he accepted $200 in cash and $500 via a charge to her Master Card as partial payment of his fee.

(18) Respondent failed to remit the $200 cash which he received from [E] to [C].

(19) Respondent directed the [C] bookkeeper to make an entry on the law firm's cost card for [D's]

file reflecting receipt of the $500 Master Card payment made by [E].

(20) On or about March 23, 1987, [E] met with respondent in his office at [C] in [ ], Pennsylvania.

(21) At this meeting, she gave respondent and he accepted $600 in cash as partial payment of his fee.

(22) Respondent failed to remit the $600 cash which he received from [E] to [C].

(23) Thereafter, [E] referred a new client, [G], to respondent.

(24) Respondent contacted [E] and told her he was reducing his fee for representing [D] from $5,000 to $3,000 in consideration of the aforesaid referral.

(25) On or about July 7, 1987, respondent accompanied [E] to the Bail Office in [ ], Pennsylvania.

(26) The purpose of this visit was to obtain the return of the bail money which [E] has posted on behalf of [D].

(27) The Office of Judicial Support in [ ] County issued a check in the amount of $1,200 to [E], representing the original bail payment of $1,500 less a service charge of $300.

(28) [E] offered the $1,200 check to respondent as final payment on his legal fee.

(29) Respondent told her that he preferred for her to cash the check so that he could receive the $1,100 in cash.

(30) Respondent stated that [E] could retain the balance of $100 in payment for a personal loan she had previously made to him.

(31) Thereafter, respondent accompanied [E] to a local bank.

(32) At the bank, [E] cashed the check and gave $1,100 cash to respondent.

(33) Respondent failed to remit the $1,100 which he received from [E] to [C].

(34) On or about July 28, 1987, respondent directed the [C] bookkeeper to make a second entry on the cost card in the [D] case reflecting a payment of $500.

(35) This entry did not represent a specific payment by [E] or [D].

(36) Thereafter, [E] contacted [C's] bookkeeper and requested a receipt from the firm for the $3,000 which she had paid to respondent for representation of [D].

(37) The bookkeeper told [E] that according to the firm's records respondent's total fee for representation was $1,000, and that this amount had been received by the firm.

(38) Thereafter, [E] spoke with respondent on the telephone regarding this and she asked why respondent had received $3,000 and only reported $1,000 to the firm.

(39) Respondent told to [E] that this matter was on the "Q.T."

(40) Thereafter, [E] demanded that respondent return the entire $3,000 which she had paid respondent.

(41) Thereafter, [E] agreed to a refund of $2,000.

(42) [E] informed respondent that she was going to contact the head of the firm to find out what was going on.

(43) Respondent told her that respondent would be in touch with her.

(44) On or about August 7, 1987, respondent went to [E's] apartment at [   ].

(45) At this meeting, respondent gave [E] $2,000 in cash.

(46) On or about August 10, 1987, respondent admitted to [H], a shareholder partner of [C], that respondent had received the sum of $3,000 from [E].

(47) Respondent further admitted to [H] that he remitted $1,000 to the firm and retained $2,000 for himself.

(48) Respondent told [H] that he returned the $2,000, which he had converted, to [E].

(49) Respondent commingled, converted and otherwise misused $2,000 of funds belonging to and/or intended for [C] for his own purposes.

(50) Respondent, by his conduct as described in the foregoing paragraphs 8 through 49 inclusive, violated D.R. 1-102 (A)(4) and D.R. 1-102(a)(6).

## CHARGE II

(51) On or about May 17, 1987, [I] received a traffic citation in [ ], Pennsylvania, for driving a vehicle while his operating privileges were suspended.

(52) In or about June 1987, [I] called respondent and requested advice about four outstanding motor vehicle code citations.

(53) Respondent told [I] that his fee would be $1,000 and that he agreed to represent [I] in these matters.

(54) On or about June 3, 1987, [I] gave respondent and he accepted check number 179 drawn on account number [ ] at [ ] Bank of [ ], Pennsylvania in the amount of $1,000, made payable to the order of [respondent].

(55) Respondent accepted this check and negotiated it.

(56) Respondent failed to remit the $1,000 he received from [I] to [C].

(57) Thereafter, during a telephone conversation with [I] respondent told [I] that respondent was handling [I's] case outside of the firm and that respondent was handling it by himself.

(58) Sometime after on or about August 7, 1987, [I] again phoned respondent and demanded that respondent's fee be reduced from $1,000 to $200.

(59) During this conversation respondent agreed to return only $500 to [I].

(60) On or about August 10, 1987, [I] again phoned respondent and again requested that he return $800 of the fee which he had paid respondent.

(61) During this telephone conversation respondent agreed to refund $800 of the fee which he had been paid.

(62) During the telephone conversation respondent agreed to meet with [I] to return the $800.

(63) On or about August 10, 1987, respondent was fired from his position at the firm of [C].

(64) Because respondent believed that [E] and [I] had broken their promise not to report respondent's diversion of fees from the firm, he chose not to meet with [I] at the previously agreed time and place to return the $800.

(65) On or about August 10, 1987, because respondent failed to meet with [I] at the agreed time and place to return the $800, [E] telephoned respondent and demanded that respondent return the $800.

(66) During this conversation respondent agreed to make the $800 refund to [I].

(67) During the evening of on or about August 10, 1987, respondent met with [I] and [E] across the street from [C].

(68) At this meeting respondent gave [I] $800 in cash.

(69) On or about August 10, 1987, respondent admitted to [H], a shareholder partner of [C], that he received $500 from [I].

(70) Respondent told [H] he kept the $500 he received from [D] and never intended to remit the $500 to [C].

(71) Respondent commingled, converted and otherwise misused the $500 in funds belonging to and/or intended for [C] for his own purposes.

(72) Respondent, by his conduct as described in the foregoing paragraphs 51 through 71 inclusive, violated D.R. 1-102(A)(4) and D.R. 1-102(A)(6).

## CHARGE III

(73) In or about March 1987, respondent met with [G] regarding a pension matter and the return of personal property from her former employer.

(74) Respondent requested a retainer of $1,500, and upon payment of said retainer, agreed to represent her in the foregoing matters.

(75) On or about April 6, 1987, [G] gave respondent and he accepted check number 985 drawn on account number [ ] at [ ], in the amount of $1,500, made payable to [respondent].

(76) Respondent failed to remit the $1,500 he received from [G] to [C].

(77) Thereafter, [G] requested that respondent make a change in her will.

(78) Respondent agreed to modify [G's] will and requested a fee in the amount of $100 for this service.

(79) Respondent directed [G] to forward her old will and the $100 retainer to his house and not to [C].

(80) On or about July 9, 1987, [G] sent her old will and check number 1083 drawn on account number [ · ] at [   ], in the amount of $100 made payable to [respondent], at his home address.

(81) Respondent accepted and negotiated this check.

(82) Respondent failed to remit the $100 payment to [C].

(83) Thereafter, [G] came to respondent's office to sign her new will.

(84) At that time respondent requested that she accompany him to the [   ] County courthouse.

(85) Respondent told [G] that he did not "put wills through his office."

(86) Respondent accompanied [G] to the [   ] County courthouse.

(87) At the [   ] County courthouse respondent caused [G's] will to be executed and witnessed.

(88) Respondent did not put [G's] will or a copy thereof in the firm's safe.

(89) On or about August 10, 1987, respondent admitted to [H], a shareholder partner of [C], that he accepted $1,500 from [G] for representation in her civil matter.

(90) Respondent also admitted that he kept the $1,500 and never intended to remit the $1,500 to [C].

(91) Respondent admitted to [H] that he caused [G's] will to be prepared outside of the [C] office.

(92) Respondent also admitted to [H] that he received $100 for this service.

(93) Respondent further admitted that he kept the $100 and never intended to remit the $100 to [C].

(94) Respondent, by his conduct as described in the foregoing paragraphs 73 through 93 inclusive, violated D.R. 1-102(a)(4) and D.R. 1-102(A)(6).

## CHARGE IV

(95) In or about the fall of 1986, [J] was placed on an ARD program by the Court of Common Pleas of [ ] County, Pennsylvania on a charge of open lewdness.

(96) In or about April 1987, [K], contacted respondent regarding the expungement of [J's] record in the above matter.

(97) Respondent told him that his fee for the expungement would be $1,000.

(98) On or about April 24, 1987, [K] gave respondent check number 464 drawn on account number [ ] at [ ] Federal Savings & Loan Association, [ ], Pennsylvania, in the amount of $500, made payable to [respondent].

(99) Respondent accepted and negotiated this check.

(100) Respondent failed to remit the $500 to [C].

(101) On or about June 22, 1987, [K] gave respondent check number 515 drawn on account number [ ] at [ ] Federal Savings & Loan Association, [ ], Pennsylvania, in the amount of $500 in payment toward his fee in this matter.

(102) Respondent accepted and negotiated this check.

(103) Respondent failed to remit the $500 to [C].

(104) On or about August 10, 1987, respondent admitted to [H], a shareholder partner of [C], that he received the sum of $1,000 from [K].

(105) Respondent told [H] that he kept the $1,000 and never intended to remit the $1,000 to [C].

(106) Respondent commingled, converted and otherwise misused the $1,000 in funds belonging to and/or intended for [C] for his own purposes.

(107) Respondent, by his conduct as described in the foregoing paragraphs 95 through 106 inclusive, violated D.R. 1-102(a)(4) and D.R. 1-102(A)(6).

## CHARGE V

(108) In or about late 1984 or early 1985, a private criminal complaint was filed against [L] by [M] at no. [ ] in the Court of Common Pleas of [ ] County including the charges of terroristic threats, disorderly conduct and harassment by communication.

(109) On or about October 14, 1986, the matter was dismissed by Judge [N].

(110) Thereafter, [L] contacted respondent and requested that he represent him in regard to the expungement of the records in the above matter.

(111) Respondent told [L] that his fee for expungement would be $150.

(112) [L] gave respondent and respondent accepted $150 in cash for representation in this matter.

(113) Respondent failed to remit the $150 to [C].

(114) On or about August 10, 1987, respondent admitted to [H], a shareholder partner of [C], that he received the sum of $150 from [L].

(115) Respondent told [H] that he kept the $150 and never intended to remit the $150 to [C].

(116) Respondent commingled, converted and other wise misused $150 in funds belonging to and/or intended for [C] for his own purposes.

(117)   Respondent, by his conduct as described in the foregoing paragraphs 108 through 116 inclusive, violated D.R. 1-102(a)(4) and D.R. 1-102(A)(6).

## CHARGE VI

(118)   On or about August 20, 1985, a criminal complaint was filed against [O] in District Justice Magistrate District no. [   ], [   ], Pennsylvania at D.J. no. [   ].

(119)   In or about August 1985, [O] met with respondent regarding this complaint.

(120)   [O] requested that respondent represent her before District Justice [P] in [   ], Pennsylvania.

(121)   Respondent agreed to represent [O] in this case.

(122)   Respondent requested a fee in the amount of $500 to represent [O].

(123)   [O] gave respondent and he accepted a check in the amount of $500.

(124)   Respondent failed to remit the $500 to [C].

(125)   Sometime after on or about August 10, 1987, respondent admitted to [Q], a shareholder partner of [C], that he received $500 from [O] for representation in this case.

(126)   Respondent told [Q] that he kept the $500 and never intended to remit the $500 to [C].

(127)   Respondent commingled, converted and otherwise misused $500 of funds belonging to and/or intended for [C] for his own purposes.

(128)   Respondent, by his conduct as described in the foregoing paragraphs 118 through 127 inclusive, violated D.R. 1-102(A)(4) and D.R. 1-102(A)(6).

## CHARGE VII

(129) In or about August 1985, [R] met with respondent regarding a district justice complaint filed against him.

(130) Respondent agreed to represent [R] in this action.

(131) Respondent requested $300 as a fee for services to be rendered.

(132) On or about August 26, 1985, [S], [R's] mother, gave respondent and he accepted an unnumbered check drawn on account number [ ] at [ ] Bank, [ ], Pennsylvania in the amount of $300, made payable to the order of [respondent].

(133) Respondent failed to remit the $300 to [C].

(134) Sometime after on or about August 10, 1987, respondent told [Q], that he received $300 from [R] to represent him.

(135) Respondent told [Q] he kept the $300 and never intended to remit the $300 to [C].

(136) Respondent commingled, converted and otherwise misused the $300 of funds belonging to and/or intended for [C] for his own purposes.

(137) Respondent, by his conduct as described in the foregoing paragraphs 129 through 136 inclusive, violated D.R. 1-102(A)(4) and D.R. 1-102(A)(6).

## ORDER

Now, February 14, 1992, rule to show cause entered by this court on February 28, 1991, is discharged. It is hereby ordered that respondent be and he is suspended from the bar of this Commonwealth for a period of three years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.